(No. 72024.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN CHILDRESS, Appellant.

*Opinion filed February 3, 1994.—Rehearing denied April 4, 1994.*

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Eileen M. O'Neill, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, John Childress, was convicted of first degree murder, home invasion, burglary, and attempted aggravated criminal sexual assault. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant was accordingly sentenced to death for his conviction for first degree murder. On the remaining convictions, the trial judge imposed a 60-year term of imprisonment for home invasion, a seven-year term for burglary, and a five-year term for attempted aggravated criminal sexual assault. The prison terms were to run concurrently with each other but consecutively to the death sentence. The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we reverse the defendant's conviction for burglary and modify the sentences of imprisonment for the remaining offenses so that they run concurrently with the sentence of death. In all other

respects, however, we affirm the judgment of the circuit court.

There is little dispute regarding the facts in this case, and the relevant testimony is summarized below. During the evening of August 15, 1989, the defendant entered the residence of a neighbor, Sarah Cardona, and killed her. The victim, who was 30 years old at the time of her death, lived with her son, Ruben Lopez, Jr., and Ruben's father, Ruben Lopez, Sr., in Chicago. At trial, the defendant acknowledged performing the acts that caused the victim's death but asserted that the killing occurred after the victim tried to attack him with a knife.

The victim's son testified at trial. He was six years old at the time of the offenses committed here, and was eight at the time of the defendant's trial, in April 1991. Ruben testified that on August 15, 1989, he left his home to visit a friend who lived down the street. Outside, Ruben saw the defendant, whom he knew. A short time later, Ruben returned to his apartment and spoke to his mother, who said that the defendant was there. Ruben then went back to his friend's home. Ruben returned home later. At that time, he pushed open the door of his mother's bedroom and saw the defendant stabbing his mother. According to Ruben, the defendant dropped the knife he was using and ran out the back door.

A neighbor, Marie Taylor, was walking by the victim's house when she heard Ruben screaming. At trial, Taylor testified that she ran inside the victim's apartment and went to the back bedroom. Taylor said that she pushed the bedroom door open and saw the defendant having sex with the victim; at the time, a knife was protruding from the victim's chest. Taylor spoke to the defendant, who stood up and struck Taylor. The defendant then pulled his pants up, smiled at Taylor, and left.

Taylor testified that the victim got up from the bed, removed the knife from her chest, and walked to the front room of the apartment, where she collapsed. Taylor wrapped the victim in a blanket, and police officers and paramedics soon arrived. According to Taylor, the victim stated that the defendant had raped her and had said that he would kill her before he did any time. Taylor estimated that the victim was about 5 feet 1 inch or 5 feet 2 inches tall and weighed about 90 pounds.

Another neighbor, Angel Cruz, testified that he was in front of his house during the evening of August 15, 1989, when he heard screams coming from the victim's home. Cruz ran into the apartment, where he saw the victim and Marie Taylor. Taylor told Cruz that the assailant was still present, and Cruz then ran to the rear of the apartment and saw the defendant leaving through the back door. Cruz tried to follow the defendant, but the defendant eluded him. Cruz testified that he had seen the defendant about 20 minutes earlier in the alley, and that he saw the defendant enter the apartment through the back door. On cross-examination, Cruz denied that he saw the defendant knock on the door.

The defendant was arrested on August 16. A lineup was conducted, and prosecution witnesses Ruben Lopez, Jr., Marie Taylor, and Angel Cruz separately identified the defendant as the person they had seen in the victim's apartment.

The victim died on the morning of August 16. The surgeon who operated on the victim after she was taken to the hospital testified that the victim suffered major blood loss from a stab wound to her liver. According to the autopsy report, the victim sustained 12 stab wounds and 10 incised wounds and died as a result of those wounds. The pathologist who performed the autopsy did not find any sign of injury to the victim's genital area,

but he was unable to conclude that the victim had not been sexually assaulted. Toxicological testing of the victim's blood did not reveal the presence of alcohol, cocaine, or opiates.

In the defendant's case in chief, Erica Luedke, a fire department paramedic, testified that shortly after 9 p.m. on August 15, 1989, she helped transport the victim from her home to the trauma center at Illinois Masonic Hospital. Luedke testified that, according to her report, she asked the victim if she had been sexually assaulted, and the victim said that a man had attempted to assault her and had stabbed her. The victim was in shock at the time.

The defendant introduced a stipulation that Christine Braun, a criminologist in the serology department at the Chicago police department crime laboratory, examined oral, rectal, and vaginal swabs and tested them for semen and sperm, and that all three swabs were negative.

The defendant also testified at trial. The defendant said that he kept his drug paraphernalia at the victim's house so that his girlfriend would not find the items, and that he had been doing so for six months prior to the offenses charged here. The defendant estimated that he went to the victim's apartment about twice a month to use drugs. The defendant also said that on about five occasions he had provided the victim with drugs in exchange for sex.

The defendant testified that he had been drinking on the day of the offenses involved here. That evening, he bought some cocaine and took it to the victim's apartment. There, he knocked on the front door and asked the victim if he could use his "works," consisting of syringes and a bottle top. According to the defendant, the victim asked for cocaine, and the defendant said that he would give it to her in exchange for oral sex.

When the defendant was unable to respond physically, he refused to give the victim any of the drug. According to the defendant, the victim left the room and returned with a knife. The defendant and the victim argued, and then they struggled over the knife. The defendant took the knife and stabbed the victim. According to the defendant, the victim removed the knife from her body and came toward the defendant again. The defendant took the knife from the victim and stabbed her a second time. He said that he was scared and intoxicated at the time and that he did not remember seeing anyone else in the apartment. The defendant denied having sexual intercourse with the victim, but he allowed that his memory was blank after he began stabbing her. The defendant stated that he was 5 feet 7 inches tall and weighed more than 200 pounds.

In rebuttal, Chicago police officer Jerome Bogucki testified that he had searched the victim's residence for evidence following the offenses involved here. Bogucki said that he did not find any drugs or drug paraphernalia, such as hypodermic needles or bottle caps.

At the defendant's request, the jury received instructions on the provocation form of second degree murder. (See Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1).) In addition, the instructions defining home invasion and burglary were supplemented with one on the limited authority doctrine. (See *People v. Sanders* (1984), 129 Ill. App. 3d 552; see also *People v. Peeples* (1993), 155 Ill. 2d 422, 487-88.) The jury returned verdicts finding the defendant guilty of first degree murder (knowing and intentional), first degree murder (felony murder), home invasion, burglary, and attempted aggravated criminal sexual assault.

On the State's motion, the matter then proceeded to a capital sentencing hearing, which was conducted before the same jury. At the first stage of the hearing,

the State presented evidence of the defendant's conviction in 1978 in the circuit court of Cook County for the murder of Webster Hardwick. The State presented a certified copy of the conviction entered in that case as well as testimony from one of the police officers involved in the investigation. The State also introduced certified copies of the defendant's convictions in the case at bar. Finally, the prosecution established that the defendant was born in 1947 and therefore was over the age of 18 at the time of the murder here. The jury found the defendant eligible for the death penalty on both grounds urged by the prosecution: that the defendant had been convicted of two murders (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)) and that the defendant had committed the present murder in the course of a specified felony (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)).

At the second stage of the sentencing hearing, the State presented evidence of the defendant's prior offenses. Michael Shedelbower, a correctional counselor at the Centralia Correctional Center, testified regarding the defendant's criminal record. His testimony revealed that the defendant was convicted of armed robbery in 1965, of criminal trespass to vehicles in 1966, of burglary in 1969, of resisting arrest and disorderly conduct in 1972, of unlawful use of weapons in 1973, of murder in 1978, and of attempted aggravated criminal sexual assault, kidnapping, and unlawful restraint in 1986.

At the hearing, the State also presented testimony regarding the defendant's commission of the offenses underlying his 1965 and 1986 convictions. John Carpenter testified that on November 22, 1965, he was stopped in his car at an intersection when someone ran up, pointed a gun at him, and told him to get out. The person took what money Carpenter had in his pockets and then drove off in Carpenter's car. The vehicle was recovered the next day. In December 1965, the defendant pleaded guilty to a charge of armed robbery.

James Cole testified that on November 4, 1985, he was working at his shoeshine stand when he noticed a man and a woman entering a nearby apartment house that Cole owned. Cole knew that the man was not a tenant, so Cole went across the street to investigate. He found the man, whom he identified as the defendant, having sex with the woman. Cole said that the woman was a mentally retarded person who lived in a neighborhood halfway house. The defendant pleaded guilty in 1986 to charges of attempted aggravated criminal sexual assault, kidnapping, and unlawful restraint.

Sadie McGee, the defendant's daughter, testified in behalf of the State that when she was eight or nine years old the defendant asked to have sex with her; he did not do anything when she resisted. According to McGee, a similar incident happened on a later occasion, too.

The defendant presented a number of witnesses in mitigation at the second stage of the sentencing hearing. William Matthews was one of the defendant's cellmates at the minimum security unit at Stateville Correctional Center in 1984 and 1985. Matthews testified that the defendant helped him deal with prison life. Matthews further stated that the defendant was not affiliated with any prison gangs.

Georgia Dockery, a correctional counselor, also provided favorable testimony regarding the defendant's adjustment to prison life. She had been the defendant's counselor at the minimum security unit at Stateville. Dockery described the defendant as cooperative and said that the defendant did not have any major problems while he was there.

David Erickson, a former assistant State's Attorney, provided testimony regarding the 1977 murder of Webster Hardwick. Apart from the defendant, two women took part in the murder. Erickson had questioned a third woman who was also present during the offense,

and he read aloud to the jury the statement given by the third woman. Hardwick was stabbed some 96 times and, according to the third woman's statement, almost all the victim's wounds were inflicted by the two other women.

Two of the defendant's family members, Sharella Brister and Michael Branch, provided favorable testimony. In addition, Branch read aloud a letter that had been dictated to him by the defendant's mother, who was too ill to appear in court. In the letter, the defendant's mother said that the defendant was a caring and reliable person, and she pleaded for her son's life.

Audrey Preston, who was employed as a drug treatment counselor, also testified in the defendant's behalf. Preston has known the defendant since she was a teenager. Preston stated that the defendant helped her overcome an addiction to heroin, renting hotel rooms for her when she was undergoing withdrawal. Preston testified that she ended her addiction in 1971. Preston also stated that she had not talked to the defendant for the last 10 or 12 years.

At the conclusion of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude a sentence of death. The trial judge accordingly sentenced the defendant to death for the first degree murder conviction. On the remaining convictions, the trial judge sentenced the defendant to a 60-year prison term for home invasion, a seven-year term for burglary, and a five-year term for attempted aggravated criminal sexual assault. The prison terms were to run concurrently with each other but consecutively to the death sentence.

I

The defendant first argues that the trial judge erred in reopening *voir dire* at the close of evidence at the guilt-innocence phase and in removing one of the jurors

for cause because of that person's views toward capital punishment. The defendant contends that the removal of the juror was unwarranted and that the juror should have been allowed to continue serving in this case.

Michael Watkins was selected and sworn as a juror on the first day of *voir dire.* He made no response when the panel in which he appeared was asked whether anyone had scruples against the death penalty. The next morning, however, Watkins sought to speak to the trial judge. Watkins was brought into the courtroom and was sworn as a witness. Watkins told the judge, "I think I'm going to have a problem with the outcome after the guilt or innocence is decided." Watkins stated that he did not "feel real comfortable with having to make, or playing apart [*sic*] in that second decision if I have to make." The trial judge then allowed the parties to question the juror. The prosecutor asked the juror whether he would "have a problem" signing a death verdict at the conclusion of the case. The following colloquy then ensued:

"A. I think so.

Q. Okay.

Would you be able to sign it if the evidence warrants?

A. I don't think so.

Q. Okay.

Are you telling us today that under all circumstances, any kind of death case. I mean you haven't heard any evidence, but under any kind of circumstances your [*sic*] saying you couldn't sign a death verdict form?

A. It would have to be extreme, extreme circumstances and I don't, you know, not knowing anything about it I couldn't say definitely but I would strongly—I would most likely go with not being able to.

Q. Okay.

Well, we're not saying it's not a heavy responsibility. But could you at least consider in the sentencing phase a death penalty?

A. Considering it. I guess I could consider it, but I would have a lot of trouble signing the verdict."

Defense counsel then asked the juror several questions:

"Q. Mr. Watkins, can you imagine a situation or a case that was so heinous that you could impose the death penalty?

A. Yes. But I don't even know if that type of case has ever been presented, you know. That would be to such an extreme. It would be to a very large extreme.

Q. But you would be able to go in the back and talk with the other jurors and consider it if the evidence were put to you?

A. Consider it."

The prosecutor then asked the juror several more questions:

"Q. ***

Are you, because of your personal feelings, going to block out the other jurors and just not listen to what they have to say?

A. I wouldn't go so far as to say I would block out what they have to say, but at that point I would probably—that's where the real, I think the impartiality would come into play. You know, I wouldn't—being part of the whole thing, I wouldn't shut them out. But that's where my personal feelings would probably, would definitely play a part in my reactions.

***

Q. Can you follow the law as it's given to you as opposed to your personal feelings about the death penalty?

A. I guess I would have to.

Q. Well, but could you?

A. I guess very unwillingly."

The prosecutor asked that the juror be removed for cause. The trial judge declined to rule on the State's motion at that time, believing that the juror might simply be attempting to evade jury service. The judge told the parties that Watkins would remain on the jury in the meantime and that they could question the juror again at the close of evidence in the guilt-innocence phase. Neither party objected to this procedure.

At the close of evidence, the trial judge reopened the *voir dire*, permitting the parties to question Watkins

once again about his views regarding capital punishment. The defendant objected to reopening *voir dire* at that time, but the trial judge overruled the objection, noting that counsel had not previously objected. Juror Watkins then took the stand again, and the State questioned him first:

"Q. We are asking you if there is some reason, not talking about just this case, but about the death penalty in general, is there some reason that you still have that you would never be able to impose it?

A. I am not sure if I said I would never be able to the first time, but I do feel strongly against it.

Q. Are those strong feelings going to interfere with your ability to communicate with the other jurors and participate in deliberations?

A. I would be able to participate in the finding of fact. But after that, I would still have major problems in imposing that type of penalty.

Q. I apologize for the intrusion. But what do you mean by major problems? I am not sure I know what you mean.

A. I just think that that is a very very very serious penalty, and I can—at this point I can image—I can't imagine any circumstance that would warrant me to impose that penalty."

Defense counsel then questioned juror Watkins. Counsel reiterated to the juror that in a capital sentencing hearing the jury would hear additional testimony, from witnesses in aggravation and mitigation, on the question whether the death penalty should be imposed. Defense counsel then asked, "Would you be able to listen to those witnesses and then make your decision regarding the death penalty?" Watkins replied, "I would hear—I would hear what they were saying." After hearing argument on the question, the trial judge granted the State's motion to remove the juror for cause, replacing him with the first alternate juror.

We conclude, as a threshold consideration, that it was not error for the trial judge to reexamine Watkins after he had been selected and sworn as a juror. In other

circumstances, *voir dire* has been properly reopened after the jury has been selected and sworn (see *People v. Jarnagan* (1987), 154 Ill. App. 3d 187, 197) or it has been held to be error not to do so (see *People v. Kurth* (1966), 34 Ill. 2d 387, 390-91; *People v. Mitchell* (1984), 121 Ill. App. 3d 193, 194-96; *People v. Peterson* (1973), 15 Ill. App. 3d 110, 111). We do not believe that the trial judge abused his discretion in reopening *voir dire* in this case. On the day after his selection as a juror in this case, Watkins informed the court that he would have difficulty in considering a death sentence, if that were necessary. It was entirely proper for the judge to then question the juror further, to determine whether he was qualified to serve on the jury in this case. In addition, we believe that it was within the trial judge's authority for the judge to reserve ruling on the State's motion to remove juror Watkins for cause and to examine the juror further at the conclusion of the guilt-innocence phase of the proceedings. As we have noted, the trial judge had some doubts regarding the juror's sincerity and thought that the juror might simply be raising the question in an attempt to avoid jury service in this case.

Turning now to the merits of the trial judge's ruling, we believe that removal of the juror in question was proper. In determining whether a prospective juror may be excused for cause because of the person's views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.

We have previously noted that the trial judge is in a "superior position *** to gauge the meaning of the prospective juror's responses" during *voir dire*, and the

judge's determination must therefore be granted deference. (*People v. Emerson* (1987), 122 Ill. 2d 411, 439.) The juror's remarks must be considered as a whole. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 386; *People v. Gaines* (1981), 88 Ill. 2d 342, 356-57.) A trial judge need not follow a "set catechism" in posing questions on *voir dire*, and it may be appropriate to exclude a juror though he has not expressed himself with "meticulous preciseness." *People v. Szabo* (1983), 94 Ill. 2d 327, 354; *People v. Gaines* (1981), 88 Ill. 2d 342, 356.

Considering the entirety of juror Watkins' responses during *voir dire*, we do not believe that the trial judge erred in excusing him for cause because of his views regarding capital punishment. The juror's responses to the questions put to him by the court and by counsel show clearly that Watkins disapproved of capital punishment and that, because of his views on the question, he would have had great difficulty in voting to impose the death sentence.

The defendant next argues that the trial judge erred in refusing to admit evidence that the victim in this case, Sarah Cardona, had previously been arrested for the possession of cocaine. The arrest occurred in March 1988, and Cardona later received a term of probation for the offense. The defendant believes that the evidence of Cardona's arrest would have helped substantiate his theory of defense and, in particular, his claims that he kept drug paraphernalia at the victim's residence and that he and the victim had previously exchanged drugs for sex.

Defense counsel's offer of proof revealed the following details of the victim's offense. The arresting officer, Mark Wiktorek, testified that on March 30, 1988, he saw Sarah Cardona drop a plastic bag containing a white powdery substance on a Chicago street. The white powder was later determined to contain cocaine. Officer

Wiktorek arrested the victim for possession of a controlled substance. In response to questions, the officer stated that he could not remember whether, at the time of the arrest, Cardona appeared to be on drugs, was in possession of a large amount of money, or had needle marks on her arms.

The record further discloses that Cardona pleaded guilty to the charge in September 1988 and, as a first offender, received a sentence of probation pursuant to section 410 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1989, ch. 56$^1$/$_2$, par. 1410); a disposition under that provision does not result in a conviction if the person successfully completes the probationary term. In Cardona's case, the period of probation had not yet expired at the time of her death. The trial judge refused to admit the evidence of the victim's arrest, concluding that it was not probative that the victim habitually used drugs or that she would exchange drugs for sex.

The defendant contends here that the evidence of the victim's prior possession of cocaine would have corroborated the defense assertions that the victim allowed the defendant to keep drug paraphernalia at her home, that the defendant went to the victim's apartment on August 15, 1989, to use drugs, and that the victim agreed at that time to exchange sex for cocaine. The defendant maintains that the proffered evidence would have made his own testimony more credible and also would have strengthened his claim that the victim attacked him when he refused to share his cocaine with her.

Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, quoting Fed. R. Evid. 401.) "A trial court may reject offered evidence

on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature." *People v. Ward* (1984), 101 Ill. 2d 443, 455.

Contrary to the defendant's contention, we believe that it is appropriate to review this issue under an abuse of discretion, rather than *de novo*, standard. The decision whether to admit evidence cannot be made in isolation. The trial judge must consider a number of circumstances that bear on that issue, including questions of remoteness and prejudice. Generally, then, the admission of evidence is a question reserved to the discretion of the trial judge. See *People v. Patterson* (1992), 154 Ill. 2d 414, 461; *People v. Enis* (1990), 139 Ill. 2d 264, 281; *People v. Boclair* (1989), 129 Ill. 2d 458, 476; *People v. Johnson* (1986), 114 Ill. 2d 170, 193; *People v. Gorney* (1985), 107 Ill. 2d 53, 59; *Ward*, 101 Ill. 2d at 455-56.

On this record, we do not believe that the trial judge abused his discretion in excluding this evidence. The victim's arrest was too remote in time to be relevant here. The arrest preceded the present offenses by nearly $1^1/_2$ years. There was no evidence that the victim had used drugs or had otherwise violated the terms of her probation during that period. Moreover, the arresting officer was unable to remember any details about the case beyond the bare outline contained in his report. The report disclosed only the basic facts of the arrest and contained no additional information that would suggest that the victim was a habitual user of drugs.

The defendant's final challenge to the guilt-innocence phase concerns the State's closing argument at that portion of the proceedings. The defendant contends that the prosecution improperly emphasized the characteristics of the victim's family and the effects of the crime on her survivors, and that the prosecutor's

comments could only have diverted the jury's attention from its consideration of the evidence in the case.

In his brief before this court, the defendant complains of the following nine comments. In the first of these, the prosecutor remarked, at the beginning of his summation, "[B]ack on August 15 of 1989, Sarah Cardona was a young woman. She was a mother, and she was a wife through most of that day until around 9:30 when she made the mistake of her life." Referring to the life-and-death photograph of the victim, taken several days before the victim's death, the prosecutor next stated, "'As you will see in this life photo, three days prior she had attended the wedding of her sister and was with her family and was alive and well and happy." Later, in describing the commission of the offenses, the prosecutor commented that the defendant "violate[d] the sanctity of her, Ruben, and little Ruben's home."

Discussing the testimony of the victim's son, Ruben Lopez, Jr., the prosecutor said, "He stood up, that courageous little boy, stood up and pointed to the man who killed his mother." Again referring to Ruben's testimony, the prosecutor subsequently remarked, "It came from the mouth of an innocent child which gives great weight to that phrase 'suffer the little children.'" Referring to the defendant, the prosecutor then stated, "Because of his acts, look at the wide expanse of suffering by other people." Defense counsel objected to that remark, and the trial judge sustained the objection. The prosecutor then commented, "People who are [a]ffected by his acts had no choice in that matter. None. *** Little Ruben certainly wouldn't have had the choice of going in and finding his mother being murdered. *** It tells you his lack of respect for a six-year-old boy who comes in when he is having his way with the six-year-old's mother ***."

The defendant contends that the preceding remarks

improperly stressed the family status of the victim, the youthfulness of her son, and the human suffering produced by these crimes. The defendant believes that the prosecutor's comments served only to distract the jury from its task of determining whether the defendant had been proved guilty of the offenses charged here.

As noted above, defense counsel objected to only one of the comments being challenged on review, and the trial judge sustained the objection. With regard to that comment, then, we conclude that the trial judge's action was sufficient to forestall any prejudice. "[A]lthough the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court [citation], the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. [Citations.]" (*People v. Baptist* (1979), 76 Ill. 2d 19, 30.) We believe that the judge's ruling sustaining defense counsel's objection was similarly effective here. We note, too, that the jury was instructed on the purpose of closing argument. See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2d ed. 1981).

The defendant failed to make contemporaneous objections to any of the other comments being challenged on review, however. Because counsel's one objection was sustained, the defendant cannot—and does not—argue here that additional objections would have been fruitless. The unobjected-to comments are cognizable on appeal only if they rise to the level of plain error. (See 134 Ill. 2d R. 615(a) (on review, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").) We do not believe that the plain error exception is applicable in the present case.

We consider the present case to be distinguishable

from *People v. Bernette* (1964), 30 Ill. 2d 359, on which the defendant primarily relies. In *Bernette*, the murder victim's widow described her living arrangements at the time of trial, testified to the range of ages of her four children, and stated that the youngest child—seven months old—was the only one born of her marriage to the victim. The prosecutor returned to this theme in closing argument. Referring to the victim, the prosecutor stated, " 'he had a wife, he had a child and he had a right—he was only 20 years old when he died—to be with that family and to pursue his life and liberty.' " (*Bernette*, 30 Ill. 2d at 371.) This court concluded that the presentation of the evidence and argument was reversible error, notwithstanding defense counsel's failure to object. The court stated:

> "The evidence in regard to the decedent's child and step-children was not brought to the notice of the jury incidentally, but was presented by a series of questions in such a way as to permit the jury to understand that it was a matter material and proper to be proved. If any doubt existed, it was removed when the prosecutor went to the extreme of eliciting the ages of the children involved. This entire segment of the evidence, having no relevance to guilt or innocence, could only have had the purpose of prejudicing defendant in the eyes of the jury 'and to arouse in them anger, hate and passion.' [Citation.]" *Bernette*, 30 Ill. 2d at 372.

In the present case, we believe that a number of the remarks now challenged by the defendant were appropriate comments on properly admitted evidence. The victim was attacked in her home by an acquaintance, a neighbor, and the crimes were discovered by the victim's six-year-old son. In this case, then, some testimony regarding the victim's family was necessary to explain the circumstances of the defendant's offenses. (See *People v. Ward* (1992), 154 Ill. 2d 272, 302; *People v. Simms* (1988), 121 Ill. 2d 259, 268.) Moreover, it was proper for the prosecutor to comment on the

youthfulness of thevictim's son and his poise as a witness at trial. The prosecutor's remarks on the photograph of the victim, which was taken shortly before her death, were drawn from the testimony of Anna Greiner, the victim's sister, who appeared as a "life and death" witness and supplied the foundation for the picture's admission into evidence. For these reasons, we conclude that much of the material now complained of was properly admitted into evidence and was properly a subject of closing argument, and we do not discern in the present record an attempt, like that condemned in *Bernette*, to put before the jury prejudicial and irrelevant information.

Several of the unobjected-to comments listed earlier were perhaps unnecessary. We do not believe, however, that they constitute plain error. The plain error exception does not operate as a general savings clause (*People v. Precup* (1978), 73 Ill. 2d 7, 16); it may be invoked only when the evidence is closely balanced or the alleged error denied the defendant a fair trial (*People v. Herrett* (1990), 137 Ill. 2d 195, 209-10; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-78). Neither one of these conditions obtains here. We do not believe that the challenged comments deprived the defendant of a fair trial. We have said many times that jurors are certain to realize that murder victims do not live in a vacuum and that they are survived by grieving family members. (*People v. Page* (1993), 155 Ill. 2d 232, 269; *People v. Williams* (1991), 147 Ill. 2d 173, 230; *People v. Thomas* (1990), 137 Ill. 2d 500, 525; *People v. Hope* (1986), 116 Ill. 2d 265, 275-76; *People v. Free* (1983), 94 Ill. 2d 378, 415.) The particular comments challenged here came in the course of lengthy arguments by the parties, and they did not receive any special emphasis by the prosecution.

Nor was the evidence in this case closely balanced. The defendant's identity as the assailant was unchallenged. Marie Taylor and Ruben Lopez, Jr., saw the de-

fendant stabbing the victim, and Taylor testified that the defendant was having sex with the injured woman. In addition, Angel Cruz, who was on the scene immediately after the commission of the offenses, saw the defendant leave the premises. The defendant did not deny that he stabbed the victim, claiming instead that the homicide was second degree murder (provocation). The evidence showed overwhelmingly that the defendant had stabbed and then raped the victim. On this record, then, we are unable to conclude that the comments rose to the level of plain error.

## II

The defendant raises a number of arguments relating to the capital sentencing hearing conducted in this case. We will consider these issues in the sequence in which they arose in the proceedings below.

The defendant's initial challenge to his sentence of death involves the jury instructions used at the first, or eligibility, phase of the bifurcated sentencing hearing. The State based the defendant's eligibility for the death penalty on two statutory aggravating circumstances: that the defendant had twice been convicted of murder, and that the defendant committed the present murder in the course of certain specified felonies. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(b)(3), (b)(6).) With regard to the latter aggravating circumstance, the felonies alleged were the noncapital crimes for which the defendant had been convicted at trial: home invasion, burglary, and attempted aggravated criminal sexual assault. At the conclusion of the first stage of the sentencing hearing, the jury found that both of the aggravating circumstances had been proved beyond a reasonable doubt.

The defendant now contends that he could not have been guilty of burglary. Relatedly, the defendant argues that if the burglary conviction falls, the eligibility determination under the second aggravating circumstance

must also fall. Finally, the defendant believes that the invalidity of this second aggravating circumstance means that he must be granted a new sentencing hearing.

The defendant correctly observes that he did not commit burglary. Section 19—1 of the Criminal Code of 1961 defines the offense of burglary as follows:

> "A person commits burglary when without authority he knowingly enters or without authority remains within a building, housetrailer, watercraft, aircraft, motor vehicle as defined in The Illinois Vehicle Code, railroad car, or any part thereof, with intent to commit therein a felony or theft. This offense shall not include the offenses set out in Section 4—102 of The Illinois Vehicle Code, nor the offense of residential burglary as defined in Section 19—3 hereof." (Ill. Rev. Stat. 1989, ch. 38, par. 19—1.)

Section 19—3 of the Criminal Code defines the offense of residential burglary in the following terms:

> "A person commits residential burglary who knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." (Ill. Rev. Stat. 1989, ch. 38, par. 19—3.)

As the defendant observes, the two offenses are mutually exclusive. Residential burglary can be committed only in dwelling places, while simple burglary cannot occur in a dwelling place. The victim in the present case was attacked and killed in her own home, and thus the defendant could not have been guilty of burglary. Although the defendant failed to raise this point in the proceedings below, he now asks that his conviction for burglary be vacated. The State agrees that the conviction should be vacated, and we vacate the defendant's conviction for that offense.

We must next determine whether the jury's eligibility determination must also fall with the loss of the burglary conviction. The jury instructions for the felony murder aggravating circumstance (see Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)) listed disjunctively three

predicate felonies, including burglary, without requiring the jury to specify which of the three formed the grounds for its determination that the aggravating circumstance had been established. As we have seen, however, the defendant should not have been convicted of burglary. Moreover, we note that although the evidence in this case would have sustained a conviction for residential burglary, that offense was not then one of the predicate felonies for the felony murder aggravating circumstance; at the time of the offenses charged here, section 9—1(b)(6) included burglary but, incongruously, not residential burglary as a predicate felony. See *People v. Simms* (1991), 143 Ill. 2d 154, 169-70; *People v. Chandler* (1989), 129 Ill. 2d 233, 250-55.

Notwithstanding the unavailability in this case of burglary as a predicate felony, we do not agree with the defendant that the jury's determination under the murder-in-course-of-felony aggravating circumstance was rendered invalid for that reason. During the guilt-innocence phase of the proceedings, the same jury had found the defendant guilty of home invasion and attempted aggravated criminal sexual assault, the two other predicate felonies on which the State sought to base this aggravating circumstance. In view of the jury's earlier verdicts, we consider the erroneous inclusion of burglary among the predicate felonies for the murder-in-course-of-felony circumstance to have been harmless beyond a reasonable doubt. (*Cf. Simms*, 143 Ill. 2d 154 (court declined to undertake harmless-error analysis in case in which different juries determined defendant's guilt and eligibility for death penalty).) We do not believe that the jury's determination would have been different if the offense of burglary had not been one of the enumerated felonies in the murder-in-course-of-felony aggravating circumstance. See *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 374-77; see also *Clemons v.*

*Mississippi* (1990), 494 U.S. 738, 752-54, 108 L. Ed. 2d 725, 741-42, 110 S. Ct. 1441, 1450-51.

Finally, the defendant argues that he is entitled to a new hearing in aggravation and mitigation because the sentencing jury should not have been allowed to consider this circumstance in aggravation. Given our conclusion that the murder-in-course-of-felony aggravating circumstance was valid, however, we must reject this further contention. We note that the defendant does not make the distinct argument that he is entitled to a new hearing in aggravation and mitigation because the jury considered, at that point in the proceedings, the now-vacated burglary conviction. In any event, we would reject that contention. The defendant's offense here, if not burglary, would have been residential burglary. The jury was free to consider the circumstances of the defendant's conduct. See *People v. Hampton* (1992), 149 Ill. 2d 71, 91-92.

In a related argument, the defendant contends that the jury received improper instructions on the mental states necessary to sustain the murder-in-course-of-felony aggravating circumstance. Section 9—1(b)(6)(b) of the Criminal Code contains the following requirement for application of that aggravating circumstance:

> "in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual ***, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another[.]" Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)(b).

In the present case, the jury instructions used at both stages of the bifurcated sentencing hearing failed to mention the requirement that the defendant have acted "with the intent to kill the murdered individual or with knowledge that his acts created a strong

probability of death or great bodily harm." Because of these deficiencies in the jury instructions, the defendant argues that the determinations made at the two stages of the sentencing hearing are invalid and that he is entitled to a new hearing.

Notwithstanding the failure of the jury instructions to specify that the defendant must have acted with either intent or knowledge, we conclude that the omission of that requirement was harmless in this case. First, during the guilt phase of the proceedings, the jury specifically found the defendant guilty of intentional or knowing murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a), (b)) in addition to felony murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c)). Thus, we know that the jury found that the defendant acted with intent or knowledge in causing the victim's death.

Here, the defendant was charged with separate counts of murder under sections 9—1(a)(1), (a)(2), and (a)(3) of the Criminal Code. In the jury instructions, the first two were combined in a single instruction and verdict form and were referred to together as, variously, "murder (intentional or knowing)" or "murder (knowing and intentional)." To find the defendant guilty of "murder (intentional or knowing)," the jury was instructed that it must find that the defendant intended to kill or do great bodily harm to the victim, or knew that the defendant's acts would cause the victim's death, or knew that his acts created a strong probability of death or great bodily harm to the victim. The jury received separate instructions on the elements the State was required to prove to establish felony murder. The jury received separate verdict forms for "murder (intentional or knowing)" and felony murder and returned verdicts finding the defendant guilty of both. As the verdicts make clear, the jury specifically found at trial that the defendant had acted with intent or knowledge in causing the victim's death.

Moreover, the portions of the sentencing instructions pertaining to the multiple-murder aggravating circumstance specifically stated that the defendant must have intended to kill two different persons. At the conclusion of the first stage of the sentencing hearing, the jury returned separate verdicts finding the defendant eligible for the death penalty on two separate grounds: the defendant's commission of multiple murders, and the defendant's commission of the present murder in the course of certain felonies. With regard to the first of these statutory aggravating circumstances, the verdict specifically stated, "The defendant has been convicted of murdering two or more persons so long as the deaths were the result of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another ***." Thus, the jury again found that the defendant had acted with knowledge in causing the death of the victim in this case.

For these reasons we find distinguishable *People v. Ramey* (1992), 151 Ill. 2d 498, on which the defendant principally relies. Like the jury instructions used in the present case, the instructions used in *Ramey* for the murder-in-course-of-felony aggravating circumstance failed to mention the requirement that the defendant have acted with knowledge or intent in causing the death of the victim. In *Ramey*, however, the requisite finding had not been made at any other stage in the proceedings. The murder-in-course-of-felony circumstance was the sole statutory aggravating circumstance alleged in that case. In addition, at trial the jury had returned a general verdict of murder, without specifying which particular form or forms of the offense had been proved. Based on the record in *Ramey*, this court was unable to determine whether the jury had made the necessary finding that the defendant had committed the

murder with intent or knowledge. The record in the present case, however, is far different. As we have seen, the jury made the necessary determination on two separate occasions: once at trial, in convicting the defendant of "murder (intentional or knowing)," and later at the sentencing hearing, in concluding, with respect to the multiple-murder aggravating circumstance, that the defendant had knowingly committed this murder and a previous murder. On this record, then, we conclude that the failure of the jury instructions to include the material found in section 9—1(b)(6)(b) was harmless beyond a reasonable doubt. The jury's determination that the defendant was death-eligible under this aggravating circumstance was valid, and therefore we need not address the defendant's further contention that he is entitled to a new sentencing hearing because the jury was basing its sentencing determination in part on an invalid aggravating circumstance.

The defendant also raises a number of contentions regarding the second stage of the bifurcated sentencing hearing. Prior to the presentation of evidence in aggravation and mitigation, defense counsel renewed its request, originally made before trial, that the defendant be granted an opportunity for allocution. Counsel asked the judge to allow the defendant to address the jury without being placed under oath or being subject to cross-examination. The judge denied the defendant's request. Before this court, the defendant acknowledges that the judge's ruling was consistent with our prior decisions, but he invites us to reconsider the issue, noting that a number of other courts have found a constitutional right to allocution.

This court's cases have consistently held that there is no right, statutory or constitutional, to allocution at a capital sentencing hearing. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 280-82; *People v. Christiansen* (1987), 116

Ill. 2d 96, 127-29; *People v. Gaines* (1981), 88 Ill. 2d 342, 374-79. See also *People v. Perez* (1985), 108 Ill. 2d 70, 88-89; *People v. Szabo* (1986), 113 Ill. 2d 83, 95.) In addition, this court has held that allowing allocution in noncapital proceedings (see Ill. Rev. Stat. 1989, ch. 38, par. 1005—4—1(a)(5)) while forbidding it in capital proceedings does not deny capital defendants equal protection (*Christiansen*, 116 Ill. 2d at 128-29; *Gaines*, 88 Ill. 2d at 379-80). Notably, none of the cases cited by the defendant in support of this argument involved capital sentencing hearings. See *Boardman v. Estelle* (9th Cir. 1992), 957 F.2d 1523; *United States v. Moree* (5th Cir. 1991), 928 F.2d 654; *United States v. Jackson* (11th Cir. 1991), 923 F.2d 1494.

This court has also rejected the defendant's further contention that the admissibility of hearsay evidence at the second stage of a capital sentencing hearing means that allocution should also be permitted. Hearsay is significantly different from a statement made by a defendant in allocution: the witness who testifies to the hearsay is under oath and is subject to cross-examination, but the person speaking in allocution is not. (*Kokoraleis*, 132 Ill. 2d at 281.) In accordance with this court's prior decisions, we conclude that the trial judge in the present case did not err in denying the defendant's request for allocution.

The defendant next argues that the trial judge improperly sustained certain objections by the prosecution to defense counsel's opening statement at the second stage of the capital sentencing hearing. In opening statement, defense counsel told the jury that if the defendant were not sentenced to death, he would be sentenced to natural life imprisonment instead. Counsel went on to say that the defendant would therefore die in prison if he were not sentenced to death. The trial judge sustained the prosecution's objection to this last

comment. Defense counsel then stated that the only way the defendant would not die in prison is if he were pardoned by the Governor or otherwise released. The trial judge sustained the State's objection to this remark and told defense counsel, "Stay away from this. Just tell what you're going to prove at this point. There will be an appropriate time to instruct the jury."

Because the defendant had been convicted of murder on two occasions, the trial judge would have been required by statute to sentence the defendant to a term of natural life imprisonment if the jury had failed to impose the death penalty in this case. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(c).) A jury instruction reflecting this requirement has been approved by this court and was used in the proceedings below. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 262.) The defendant contends that counsel's argument was a proper comment on the *Gacho* instruction and that the trial judge erred in restricting counsel's opening statement. The defendant maintains that this line of argument was potentially mitigating, because it could have led the sentencing jury to believe that the defendant would not pose a danger to the public in the future. The defendant asserts that the trial judge's adverse ruling thus prevented the jury from considering this theory of mitigation. The defendant failed to raise this issue in his post-trial motion, however, and therefore the question must be deemed waived unless it amounts to plain error. See *People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.

"The purpose of an opening statement is to advise the jury concerning the questions of fact involved, to prepare their minds for the evidence to be heard and give them an idea of the nature of the action and defense." (*People v. May* (1916), 276 Ill. 332, 337; accord *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 196-97.) Although the subject counsel sought to

raise was related to the "defense" in this sentencing proceeding, we do not believe that the trial judge's ruling denied the jury the opportunity to consider the defendant's theory of mitigation. The judge's ruling on the State's final objection to the comments indicated that the judge considered counsel's remarks ill-timed, rather than incorrect. Moreover, in closing argument, defense counsel was able to pursue this same theory at length, arguing to the jury that the defendant would receive a term of natural life imprisonment if he was not sentenced to death. Finally, the jury received the instruction approved by this court in *Gacho*, 122 Ill. 2d at 262. Contrary to the defendant's contention, we do not believe that the trial judge's ruling would have caused the jury to disregard the instruction. As the trial judge explained in sustaining the prosecution's last objection to defense counsel's comments, the matter was a proper subject of instruction.

The defendant next challenges the State's introduction, at the second stage of the sentencing hearing, of certain testimony concerning conditions in medium-security prisons in Illinois. During the second stage of the hearing, prosecution witness Michael Shedelbower, a correctional counselor at Centralia Correctional Center, a medium-security facility where the defendant had once been incarcerated, provided testimony concerning conditions at Centralia. The defendant now argues that this portion of Shedelbower's testimony was irrelevant and prejudicial. Shedelbower also provided testimony concerning the defendant's criminal record, to which the defendant makes no objection.

In his testimony, Shedelbower described the range of educational and rehabilitative programs available to inmates at Centralia, the schedule of visiting hours there, and inmates' library and mail privileges. Shedelbower also stated that inmates are allowed to buy food

and clothing at the prison commissary, and to have television sets, radios, and tape players in their cells. Inmates at Centralia have keys to their own cells, and the doors at the facility have windows without bars. According to Shedelbower, visitors have remarked that the facility resembles a college campus.

Before this court, the defendant argues that the testimony concerning conditions at Centralia was irrelevant. The defendant makes note of the evidence in this case that persons sentenced to natural life—as the defendant would have been if he had not received the death penalty—are almost always confined in maximum-security facilities. The defendant argues further that the possibility that he would have been eligible for placement at Centralia was speculative. Finally, the defendant maintains that the evidence about Centralia did not "bear on the aggravating or mitigating factors, the circumstances of the offense or the character or rehabilitative potential of the particular defendant" (*People v. Barrow* (1989), 133 Ill. 2d 226, 280) and was therefore irrelevant in any event.

Shedelbower testified virtually without objection from the defense; except for a hearsay objection to one comment by Shedelbower, the defendant did not object to the remainder of the witness' testimony. In addition, the defendant failed to raise this issue in his post-sentencing motion. We are therefore precluded from considering this question unless it rises to the level of plain error. See *People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.

As noted earlier, the plain error exception is invoked only when the evidence is closely balanced or the alleged error operated to deny the defendant a fair proceeding. (*People v. Walker* (1985), 109 Ill. 2d 484, 504.) We do not believe that Shedelbower's testimony deprived the defendant of his right to a fair sentencing

hearing. First, that portion of the testimony pertaining to conditions at Centralia was not entirely devoid of relevance, as the defendant asserts it was. The evidence shows that the defendant had previously been confined in medium-security and minimum-security facilities, including Centralia, and had conducted himself well in those settings. It was not inappropriate for the prosecution to present evidence regarding the nature of those facilities, particularly when the defendant was to assert, through evidence and argument, that he could make a good adjustment to prison life.

In addition, the aggravating and mitigating evidence at the second stage of the sentencing hearing was not in close balance. The defendant had a lengthy criminal record, beginning with the offense of armed robbery, which he committed in 1965 when he was 18, and culminating in the offenses charged here, which he committed in 1989 at the age of 42. In the intervening period, the defendant committed a number of violent offenses, including murder in 1977, and attempted criminal sexual assault and other crimes in 1986. As we have noted, the testimony concerning conditions at the Centralia facility had some relevance in the present case, in juxtaposition to the defendant's own evidence concerning his ability to adjust to prison life. On this record, then, we are unable to say that the introduction of Shedelbower's testimony constituted plain error.

The defendant also raises challenges to two portions of the prosecution's closing argument at the conclusion of the second stage of the death penalty hearing. The defendant first contends that the prosecutor improperly told the jury that the defendant might escape from prison if he were not sentenced to death. Because the defendant had previously been convicted of murder, the trial judge would have been required by statute to sentence the defendant to a term of natural life impris-

onment if the jury had not decided to impose the death penalty. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(c).) In closing argument at the second stage of the sentencing hearing, the prosecutor read to the jury the instruction that is to be used when a term of natural life imprisonment is the statutorily required alternative to the death penalty. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 262.) That instruction informs the jury that the defendant will be sentenced to natural life imprisonment if he is not sentenced to death and, further, that a person serving a term of natural life imprisonment may not be paroled or released except through an order of the Governor or by executive clemency. (Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (2d ed. Supp. 1989).) After reading the instruction, the prosecutor commented, "What that doesn't tell you is this. What about escape?" Defense counsel objected immediately, but the trial judge overruled the objection. Continuing with this line of argument, the prosecutor then stated:

> "This instruction doesn't tell you anything about escape. What you know about John Childress is that when he's in the penitentiary for determinate amounts of time, 1 to 3, 1 to 3 again, 14 to 20, he knows he's getting out. He knows that if he behaves, he will get out on time or earlier. He's not an escape risk then.
>
> What you don't know and what you can only imagine is what evil will boil in his veins when he's serving a natural life sentence and he knows he may never get out."

Although the defendant did not specifically object to this last series of remarks, we note that the judge had overruled counsel's objection to the comment immediately preceding them.

We agree with the defendant that the prosecutor's suggestion that the defendant posed an escape risk was improper. The *Gacho* instruction is not in need of elaboration. The instruction is designed to fully inform jurors about the sentencing alternative for a defendant who is to receive, at minimum, a term of natural life

imprisonment. The instruction includes the information that a term of natural life may be abridged through an executive order. We do not believe that it is necessary, or advisable, to add escape to the *Gacho* instruction.

Comments on the possibility that a defendant might escape from prison are appropriate only if they are supported by evidence. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 429; *People v. Holman* (1984), 103 Ill. 2d 133, 163.) There was no testimony presented here that the defendant, during his prior periods of incarceration, had ever attempted to escape or had even been considered an escape risk by prison authorities. In fact, the sentencing evidence showed the opposite: that the defendant had previously adjusted well to prison life and had been classified as a low escape risk. On this record, then, we believe that the trial judge should have sustained defense counsel's objection to the initial comment. We note that at the hearing on the defendant's post-trial motion, the trial judge agreed with the defendant that the remarks about escape were error.

Although we believe that the prosecutor's argument concerning escape was improper, we do not agree with the defendant that a new sentencing hearing is necessary in this case. First, the remarks complained of were relatively brief. Moreover, the aggravating evidence in this case was substantial. The defendant's criminal record was lengthy, spanning nearly 25 years. In 1965 the defendant pleaded guilty to armed robbery. The defendant committed murder in 1977 and attempted criminal sexual assault in 1986. The present offenses were particularly brutal. The defendant sexually assaulted the victim and stabbed and cut her repeatedly. Given the weight of the evidence in aggravation, we consider that the error in this portion of the State's argument was harmless. Finally, we note that at the hearing on the defendant's post-sentencing motion, the trial judge

agreed with defense counsel that the escape argument was error yet did not believe that a new sentencing hearing was required. The trial judge is in a superior position to gauge the effect on the jury of potentially prejudicial remarks. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) For these reasons, we do not believe that the prosecutor's erroneous comments concerning escape require that the defendant be granted a new sentencing hearing.

The defendant also contends that the prosecutor, in closing argument at the second stage of the sentencing hearing, made improper use of witness Michael Shedelbower's testimony regarding conditions at Centralia. As we have noted, the jury in this case was to receive an instruction, of the type approved by this court in *People v. Gacho* (1988), 122 Ill. 2d 221, 262, explaining the defendant would be sentenced to a term of natural life imprisonment if he was not sentenced to death. Referring to the *Gacho* instruction, the prosecutor stated:

"Another thing you know, much talk was made about maximum security prison. This instruction doesn't say one word that he's going to a maximum security prison, and you heard from Michael Shedelbower that he's down at Centralia, no bars on the windows in Centralia. It's been described to him as much like a college campus.

There's no guarantee that Mr. Childress won't be a member of that college campus if you sentence him to natural life.

Do you want John Childress walking around a prison like Centralia? Based on what he's done, the People of the State of Illinois submit not."

Defense counsel did not object to the prosecutor's comment. The defendant now contends that it was improper for the prosecutor to assert that the defendant might be confined at Centralia if he did not receive the death penalty. Again, relief is available to the defendant only if the alleged error rises to the level of plain error.

We do not approve of the manner in which the prosecutor attempted to elaborate on the *Gacho* instruction. A sentencing jury should not be concerned with the type of institution in which a defendant will be placed if he does not receive the death penalty. The placement of prisoners within the various facilities of the Department of Corrections is a decision made by the Department, and depends on a number of circumstances; it would be speculative for either the prosecution or the defense to attempt to anticipate the exact course of an inmate's future life in the corrections system.

Notwithstanding these concerns, we do not believe that the prosecutor's comment was plain error. The remark was only a brief portion of a lengthy summation, and the prosecutor did not dwell on the notion. In addition, we do not consider the evidence in aggravation and mitigation to be closely balanced. The sentencing jury had before it extensive evidence regarding the defendant's commission of the present offenses, as well as the full history of his prior criminal conduct. On this record, we decline to ignore defense counsel's procedural defaults, and we consider the present contention to have been waived.

In addition to his conviction for murder, the defendant was found guilty of home invasion, attempted aggravated criminal sexual assault, and burglary. The trial judge sentenced the defendant to a 60-year term of imprisonment for the conviction for home invasion, to a seven-year term for the conviction for burglary, and to a five-year term for the conviction for attempted aggravated criminal sexual assault. The judge ordered the three prison terms to run concurrently with each other but consecutively to the death sentence. The defendant now argues that the judge erred in making these sentences consecutive to his death sentence.

We have already found that the defendant should

not have been convicted of burglary, so that conviction and its accompanying sentence must be vacated. Further, the State agrees with the defendant that the defendant's two remaining prison terms—the 60-year sentence for home invasion and the five-year sentence for attempted aggravated criminal sexual assault— should run concurrently with the death sentence, and we modify the sentences of imprisonment accordingly. See *People v. Johnson* (1992), 149 Ill. 2d 118, 159; *People v. Terrell* (1989), 132 Ill. 2d 178, 229-30.

In his final series of arguments, the defendant contends that various aspects of the Illinois death penalty statute (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) render it unconstitutional (see U.S. Const., amends. VIII, XIV). This court has previously rejected these same contentions, however, and we find no reason to reach a different result in this case.

The defendant first argues that the death penalty statute effectively bars the sentencer from giving meaningful consideration to evidence in mitigation. The defendant bases this contention on the provision of the statute that directs the sentencing authority to impose the death penalty if the sentencer "determines that there are no mitigating factors sufficient to preclude the imposition of" that sentence. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(g), (h).) The jury in the present case was given instructions containing this phrasing. (See Illinois Pattern Jury Instructions, Criminal, Nos. 7C.05, 7C.06, 7C.08 (2d ed. Supp. 1989).) A jury receiving such instructions has already found the particular defendant eligible for the death penalty, and the defendant argues here that the language used in the instructions in effect required him to negate, or contradict, the jury's earlier eligibility determination. This court has consistently rejected this theory, however, concluding that it rests on a strained reading of the statute. (*People v. Page*

(1993), 155 Ill. 2d 232, 283; *People v. Strickland* (1992), 154 Ill. 2d 489, 538-39; *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 115-17.) We reaffirm those decisions today.

In a further challenge to the constitutionality of the death penalty law, the defendant argues that a number of features of the Illinois statute, working in combination, enhance the risk that the sentence will be imposed arbitrarily and capriciously. The defendant makes note of the following: the prosecutor's discretion in determining whether to seek the death sentence, the failure to require pretrial notice to the defense that the penalty will be sought, the limited comparative proportionality review undertaken by this court, the failure to require the sentencer to make written findings in support of its decision, the failure to limit proof in aggravation to evidence disclosed to the defense prior to trial, the failure to impose a burden of proof on the prosecution at the second stage of the hearing, language in the statute that the sentencer may construe as placing a burden of proof on the defense, and the failure to inform the sentencer of the precise range of sentences available if the death penalty is not imposed. This court has already rejected challenges to these aspects of the statute (*e.g.*, *People v. Maxwell* (1992), 148 Ill. 2d 116, 149-50; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 407-09; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 289-91), and we do not believe that these features, in combination, render the statute invalid. "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part and vacated in part. The clerk of this court is directed to enter an order setting Thursday, May 12, 1994, as the date on which

the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Convictions affirmed in part*
*and vacated in part;*
*death sentence affirmed.*