(No. 85426.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MAYNARD McCALLISTER, JR., Appellant.

*Opinion filed July 6, 2000.—Rehearing denied October 2, 2000.*

BILANDIC, J., joined by MILLER, J., specially concurring.
HARRISON, C.J., dissenting.

Charles Schiedel, Deputy Defender, and Charles W. Hoffman, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Robert Haida, State's Attorney, of Belleville (Joel D. Bertocchi, Solicitor General, and William L. Browers and Colleen M. Griffin, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of St. Clair

County, the defendant, Maynard McCallister, Jr., was convicted of three counts of first degree murder. The same jury found defendant eligible for the death penalty. Following a hearing in aggravation and mitigation, the jury found that there were no factors sufficient to preclude imposition of the death penalty and sentenced defendant to death. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant's convictions and sentence.

## BACKGROUND

The following facts were established at trial. On December 11, 1995, the bodies of Stanley Williams, Sr., his girlfriend, Ernestine McCoy, and Ernestine's adult son, Orlando McCoy, were discovered in Williams' mobile home trailer in Washington Park, Illinois. Williams' body was found lying in the kitchen, located in the front end of the trailer. A small pocket knife was on the floor near Williams' partially pulled-out pants pocket. Williams' wallet, which contained no money, was found on the kitchen table. A revolver was found in a plastic bag, inside a closed cabinet underneath the kitchen sink. Laboratory tests revealed that this gun was inoperable.

Ernestine McCoy's body was discovered in the living room. The living room was separated from the kitchen by a waist-high counter that ran approximately half-way from one long side of the trailer to the other. Ernestine's body was on the floor, directly in front of a couch placed with its back against this counter.

Orlando McCoy's body was found near the front door to the trailer. The front door was located on one of the long sides of the trailer, and opened into the area left unobstructed by the counter separating the kitchen and living room. Orlando's body was lying a few feet from the door and was parallel to it. A large pool of blood abutted

the doorsill. Drag marks in the blood indicated that Orlando's body originally was against, or very near, the front door and was moved to its final position. A large kitchen carving knife was found under Orlando's body. Several spent .22-caliber shell casings were found on the floor near the front door. Other than the victims' bodies, there were no signs of violence or struggle in the trailer.

Autopsies revealed that all three victims died from gunshot wounds. Both Stanley Williams and Orlando McCoy were shot in the right and left temples. Ernestine McCoy was shot once in the back of the neck. Analysis of the victims' gunshot wounds indicated that the shots which killed the victims were probably fired from a distance of more than 1$^{1}$/$_{2}$ feet. Bullets were recovered from the bodies of all the victims. The two bullets recovered from Williams' head, the bullet recovered from Ernestine's neck, and one of the bullets recovered from Orlando's head were fired from the same gun. A second bullet recovered from Orlando's head was unsuitable for comparison. No murder weapon was introduced into evidence.

The bodies of the three victims were first discovered around noon on December 11, 1995, by Williams' son, Stanley Williams, Jr. At trial, Stanley acknowledged that his father sold drugs at his trailer and that he kept a gun, which was inoperable, in a cabinet near where he normally sat in the kitchen. Stanley also stated that he had never seen Orlando or Ernestine with the knife that was found under Orlando's body.

James Williams, who was not related to the Stanley Williams family, testified at trial for the State. James stated that he was 26 years old and that he had known defendant for approximately 10 years. James acknowledged that he had prior convictions for two burglaries, two thefts, and two drug offenses.

James testified that in December 1995, he, his wife,

Becky, and defendant were all living in a trailer owned by Jamie Kincannon in State Park, Illinois. On the evening of December 10, 1995, defendant moved his belongings from Kincannon's trailer to the home of his girlfriend, Dawn Daubach, in Collinsville, Illinois. Later, during the night of December 10, defendant, Daubach, James and Becky all smoked crack cocaine.

On the morning of December 11, defendant, Daubach, James and Becky decided, as a group, to purchase cocaine from Stanley Williams. The four got into Daubach's car and headed to Williams' trailer in Washington Park. James drove, defendant sat in the front passenger seat, and Daubach and Becky sat in the rear seat. At the time, defendant was wearing a trench coat, a shirt, blue jeans and brown work boots. On the way to Williams' trailer, defendant asked the group to stop at Kincannon's trailer in State Park. Defendant told the group that he wanted to retrieve a rifle which he had left there, and that he was afraid the rifle would be stolen by people who were then living in Kincannon's trailer. After arriving at Kincannon's trailer, defendant went inside. About a minute later, according to James, defendant returned to the car with the rifle wrapped in clothing. Defendant then placed the rifle under the seat of Daubach's car. At trial, James described defendant's rifle as a .22-caliber weapon with a sawed-off barrel. James stated that he saw defendant cut the barrel off the rifle some three to four weeks prior to December 11. James estimated that, with the sawed-off barrel, the rifle was about 14 to 16 inches long.

After leaving Kincannon's trailer, defendant, James, Becky and Daubach drove directly to Williams' trailer. When they arrived, James parked the car near the front end of the trailer. James and defendant then entered the trailer while the two women waited in the car. James stated that he did not see defendant bring his rifle into the trailer, and, at the time, he assumed that the rifle was still under the seat in Daubach's car.

Once inside the trailer, defendant and James went into the kitchen. Photographs of the interior of the trailer, which were published to the jury and which are part of the record on appeal, show that the kitchen was a square area. One side of the kitchen was bounded by the counter separating the kitchen from the living room. A second side, which was part of the same long side of the trailer that contained the front door, held the refrigerator. A third side of the kitchen held a window and made up the short, front end of the trailer. The final side of the kitchen, the side opposite the refrigerator, held the stove, cabinets and the kitchen sink.

James testified that he and Williams sat at the kitchen table while defendant remained standing. The table was roughly half-way between the sink and the refrigerator, and was almost against the window. James sat at the side of the table nearest the refrigerator. Williams sat opposite James at the side of the table nearest the kitchen sink. Defendant stood to Williams' right, between Williams and the counter separating the kitchen and the living room. Ernestine was sitting on the couch in the living room, with her back to the kitchen. Orlando was sitting at the end of the couch closest to the front door, or on a folding chair placed next to the couch near the front door.

According to James, Williams was the first person to speak after defendant and James entered the trailer. Williams was upset with defendant and James because they had left people waiting outside in their car. Williams was also upset because he had seen another car driving slowly around his trailer. James stated that Williams was afraid that defendant and James had brought the police with them. James also stated that, while Williams was upset, he was not yelling. James described Williams' language as "griping." Eventually, Williams asked defendant and James what they wanted. James told Williams that they

wanted to buy drugs. Williams replied, "Alright." Then, according to James, as Williams reached into his shirt pocket with his left hand, defendant pulled his rifle out from under his trench coat and shot Williams in the right temple.

James testified that it was his impression that when Williams was shot, he was reaching into his shirt pocket to retrieve a packet of cocaine. James did not believe that Williams' pocket could have contained a weapon. When Williams reached into his shirt pocket, he was not angry, and he did not say anything. Before he was shot, Williams did not get up from the kitchen table, nor did he reach toward anything other than his shirt pocket. James felt no threat from Williams at the time Williams was shot.

James testified that he heard three shots fired rapidly, "as fast as you could pull the trigger." He saw defendant turn as he fired the second and third shots. James stated that the second and third shots struck Ernestine and Orlando. However, James did not actually see these shots hit Ernestine and Orlando, as he was still looking at Williams' body when the shots were fired.

After the third shot was fired, James got up to leave. He tried to open the front door but could not, because Orlando's body was up against the door. He asked defendant to help him move the body away from the door. Defendant did not respond but, instead, shot Williams, who was lying on the kitchen floor, again. Defendant then walked over to Orlando and shot him a second time. Defendant then moved Orlando's body away from the door. According to James, defendant was standing directly over Williams and Orlando when he shot them for the second time.

As James left the trailer he became physically ill. He stood outside the front door and began choking and spitting up. He then got into Daubach's car and told the

women that defendant had shot the people inside the trailer. According to James, the women started "panicking." James stated that he was afraid defendant would come out of the trailer and kill the three of them, so he told the women to calm down. After two to three minutes had passed and defendant had not come out of the trailer, Daubach asked James to go back inside and get°him. James got out of the car and looked into the trailer through the front door. Defendant was standing in the trailer, looking at the bodies of the victims. James did not see defendant move anything in the trailer. After another minute or so, defendant came out of the trailer and got into Daubach's car.

Once they were all in the car, defendant told James to drive away and told the two women to "shut up." James stated that he saw no injuries on defendant when defendant entered the car, but did notice blood on his pants and on his boots. James did not see defendant come out of the trailer with any money or drugs.

When the group arrived back at Daubach's house, defendant told James that he was going to "take care of" Daubach and Becky because they might tell someone about the murders. However, James was able to persuade defendant not to do anything to the two women. Defendant also took James' clothes and tennis shoes, and some of his own clothes, and put them in a bag. Defendant burned his own boots in the fireplace. James stated that he and defendant then dumped the bag of clothes and the rifle in a Dumpster behind a store.

James testified that he never saw the knife which was found under Orlando's body, and that he never saw a gun while in the trailer. James recalled a conversation with defendant in which defendant said that he had been "shorted" some drugs by Williams, but stated that defendant did not seem worried about it. James also testified that he did not call the police to report the murders

because he was afraid that defendant would kill him if he did so.

On cross-examination, James acknowledged that, in December 1995, he was addicted to crack cocaine and that, for the month or two prior to December 11, 1995, he had purchased drugs from Williams almost every day. James also acknowledged that he had not slept for two days before December 11 and that, during this period, he was on a cocaine high or binge. James admitted that there were some things that he could not remember about the night of December 10 and early morning of December 11. He could not recall, for example, whether he smoked cocaine during the early hours of December 11 or how Dawn Daubach, who was working during the night of December 10 and early morning of December 11, was picked up from work. James stated, however, that he was able to recall what happened during the shootings. James also told the jury that he had not been held as a suspect in the case and that no deal had been made for his testimony against defendant. When asked, James denied shooting any of the three victims.

Becky Williams, James' wife, testified that on the morning of December 11, 1995, she, her husband, defendant and Dawn Daubach left Daubach's house and, at defendant's request, drove to Kincannon's trailer in State Park. Defendant went into Kincannon's trailer alone, and emerged carrying a shirt. The group then drove to Williams' trailer in Washington Park to purchase crack cocaine. Becky stated that it was defendant's idea to go to Williams' trailer to buy the drugs because Williams "owed him something."

After the group arrived at Williams' trailer, James and defendant went inside, while Becky and Daubach remained in the car. Shortly thereafter, Becky heard what sounded like a cap gun being fired. She heard three "pows," then a 30- to 40-second pause, and then two

more "pows." Becky then saw James come out of the trailer, pale and doubled over. When James got to the car, he told Becky and Daubach to be quiet. James then left the car and returned to the trailer door. He called to defendant to come out. Defendant, who was wearing a long trench coat, exited the trailer. Defendant did not look injured or upset, and he did not have anything in his hands.

Becky stated that defendant approached the car and, through the driver's side window, threw a wad of money on Becky's lap. Defendant then went back into the trailer. When defendant came back out of the trailer and got into the car, Becky threw the wad of money back to him. According to Becky, defendant did not have this money when he entered Williams' trailer. Becky also stated that when defendant got into the car, she saw that he had a $50 "rock" of crack cocaine in his hand.

Becky testified that as the group was heading back to Dawn Daubach's house, she and Daubach tried to ask what had happened. Defendant, however, told Becky and Daubach to "shut up." When the group arrived at Daubach's house, defendant put his bloody clothes and boots in a bag, and placed the bag outside, behind a woodpile. Later, defendant retrieved the bag and burned his clothes in the fireplace.

On cross-examination, Becky acknowledged that she was frequently using crack cocaine during December 1995. She stated, however, that on the night of December 10 and morning of December 11, she did not smoke crack cocaine. Becky further acknowledged that, in a statement which she gave to police on January 2, 1996, she indicated that she heard three or four "pops" while waiting outside Williams' trailer, instead of five. However, at trial, Becky said that she was certain that she had heard three "pops" in quick succession, followed by a pause, and then two more "pops." Becky testified that, while

she and James did not talk about the shootings at length on December 11, sometime on that day James told her that defendant had shot the three victims. Becky also stated that she and her husband had not talked about her testimony in preparation for trial.

Dawn Daubach testified that she had prior convictions for felony theft and drug possession, and that, in 1995, she was a crack cocaine addict. Daubach also stated that she and defendant were romantically involved for a period of time in late 1995.

Daubach testified that on the morning of December 11, 1995, she, defendant, James and Becky all left Daubach's house to buy crack cocaine from Stanley Williams. On the way to Williams' trailer, the group stopped at Kincannon's trailer in State Park, at defendant's request. According to Daubach, defendant said he wanted to pick up a gun which he had left there and which he feared would be stolen. The group then drove to Williams' trailer.

Daubach stated that defendant and James entered Williams' trailer, while she and Becky stayed in the car. Shortly after defendant and James entered the trailer, Daubach heard three gunshots, then a short silence, then two more shots. James then came out of the trailer holding his head and walking in circles. James walked over to the car and told Daubach and Becky that defendant "just did all three of them." Daubach then saw defendant walk out of the trailer, go back in, and then come back out. When defendant came out of the trailer, he did not appear to be injured. Daubach stated that, after defendant got into the car, he threw a wad of money onto Becky's lap, and that Becky then threw it back.

Daubach testified that when the group arrived at her house, she noticed that defendant had some crack cocaine. She had not seen the cocaine when she was in the car. Daubach stated that she smoked this cocaine

with defendant. Daubach also stated that she saw defendant burn his clothes in the fireplace. According to Daubach, defendant later explained the shootings to her by saying "that's what happens when someone disrespects me."

On cross-examination, Daubach acknowledged that she smoked crack cocaine twice on the morning of December 11, and that she had been awake for over 24 hours by the time the shootings occurred.

Dana Ganninger testified that she was addicted to crack cocaine in December 1995, and that she had six prior felony convictions, including convictions for forgery, taking marijuana into a penal institution, and theft of a motorcycle. She also stated that, in 1995, she was defendant's girlfriend.

Ganninger testified that, in December 1995, she was staying on and off at Dawn Daubach's house in Collinsville. On the morning of December 11, Daubach and Becky Williams picked Ganninger up at Kincannon's trailer in State Park and drove back to Daubach's house. When they arrived there, Ganninger went to sleep. Defendant, Daubach, James and Becky then left the house in Daubach's car. When the group returned to the house around noon, Ganninger woke up. She noticed that defendant appeared "shook up" and angry, and that James appeared "devastated." The women also appeared "shook up" and scared. Ganninger also noticed that defendant had blood on his clothes. Ganninger stated that she saw defendant and James burning clothing and defendant's boots in the fireplace. Defendant, James and Daubach then smoked crack cocaine.

Ganninger testified that later, on December 11, she was in a car with defendant at a gas station when they saw some friends. The friends asked defendant and Ganninger if they had heard that Williams had been killed. Defendant did not reply, but as defendant and Ganninger

drove away, defendant said, "You know I did that." Defendant also told Ganninger that he "couldn't believe how quick he was," and that "they didn't even have time to think." According to Ganninger, defendant also said, "Stan and his old lady and the kid—bam, bam, bam." Defendant did not mention James Williams when describing the murders to Ganninger except to say that James "couldn't even believe how fast he did it, and that Jimmy got sick." Later, defendant explained Williams' murder to Ganninger by saying, "That's what he gets for being disrespectful." Ganninger also stated that defendant threatened to kill her if she told anyone about the murders.

Ganninger further testified that in November 1995, when defendant met Stanley Williams for the first time, defendant told Ganninger that Williams had an attitude problem and "was going to get it." Ganninger stated that two weeks before the shooting, defendant purchased a rifle with crack cocaine. Defendant and James then sawed off the barrel of the rifle. Ganninger also stated that shortly before Christmas 1995, she accompanied defendant to his mother's house in Missouri. There, at defendant's request, she gave the rifle to his brother. Ganninger stated that she never saw the rifle again.

On cross-examination, Ganninger testified that, while she was addicted to crack cocaine in December 1995, she was certain that she did not smoke cocaine on the morning of December 11. Ganninger also stated that she was sure defendant had explained the murders by saying Williams had "disrespected" him, even though that explanation did not appear in a statement that Ganninger had given police on December 30, 1995. Ganninger denied speaking with Dawn Daubach or Becky Williams about her testimony in preparation for trial.

Ganninger, Daubach, James and Becky all testified to an incident that occurred shortly before Christmas 1995.

At that time, defendant threatened to shoot and kill them all, including himself, with the same rifle used on December 11, 1995, at Williams' trailer.

Defendant testified at trial in his own behalf. Defendant told the jury that he was 35 years old and that he had prior convictions for aggravated battery and theft.

Defendant stated that, in the fall of 1995, he was living in Kincannon's trailer in State Park. James and Becky Williams, whom he had known for 10 or 12 years, were also living there. Defendant testified that he was addicted to crack cocaine in the fall of 1995 and that he purchased cocaine from Stanley Williams on several occasions during this time. Defendant stated that on trips to Williams' trailer, he was usually accompanied by James Williams. Only "very seldom" did defendant go to Stanley Williams' trailer by himself.

Defendant testified that, on December 10, 1995, he and James and Becky Williams moved to Dawn Daubach's house in Collinsville. In the early evening of December 10, defendant and James drove Daubach to work in her car. Defendant and James then returned to Daubach's house where they "got high and drunk" until the following morning. Around six or seven in the morning on December 11, defendant and James picked Daubach up from work. The three then drove to East St. Louis so that Daubach could buy some cocaine. Defendant, James and Daubach then returned to Daubach's house, where, along with Becky, they ingested the cocaine. At approximately 10:30 a.m. on December 11, the group decided to buy more cocaine. According to defendant, James Williams suggested that they buy the cocaine from Stanley Williams.

Defendant stated that, on the way to Stanley Williams' trailer, he suggested that the group stop at Kincannon's trailer in State Park so that he could pick up some clothes and a .22-caliber rifle that he had

acquired with James Williams during a previous drug deal. Once inside the trailer, defendant collected his clothes and stuck the rifle inside the long, black overcoat that he was wearing. Defendant then left the trailer and threw his clothes into the back of the car. Defendant kept the rifle inside his jacket. Defendant stated that he did not show the gun to James, Becky or Daubach when he returned to the car.

Defendant testified that the group then drove to Stanley Williams' trailer. When they arrived, defendant and James entered the trailer, intending to purchase $250 worth of cocaine. Inside the trailer, Ernestine McCoy, whom defendant did not know, was seated on the living room couch. Orlando McCoy, whom defendant also did not know, was standing near the front door. Stanley Williams was seated at the kitchen table.

Defendant stated that he entered the kitchen and stood close to the sink, while James stood near the refrigerator. After they entered the kitchen, Williams asked defendant who was outside in the car. Defendant replied, "My girlfriend." Hearing this, Williams became upset. Defendant stated that, for about a minute, Williams "rambl[ed] on," yelling at defendant for bringing other people to his trailer. Williams kept standing up, looking out the kitchen window, and then sitting down. According to defendant, Williams also talked about a second car that was driving by the trailer or that was pulling in the driveway. Williams also repeatedly told defendant that he had to leave.

Defendant stated that he tried to calm Williams down. He asked Williams if he and James could "just buy what we want." Williams, however, told defendant that he was not going to sell him any cocaine. When defendant protested, Williams said that if defendant did not leave, he would "shoot your ass." Williams, while seated, then turned and reached for a cabinet under the

sink. Defendant stated that he thought that Williams was going to grab a gun from the cabinet and shoot him, so he pulled out his rifle and shot Williams. Defendant testified that, while he did not see Williams' gun on the day of the shooting, he knew that Williams kept one inside the cabinet. Defendant explained that he saw the gun on a previous occasion when he went to Williams' trailer without James. On that occasion, Williams showed the gun to defendant and told him that he would "get hurt" if he came to the trailer without James again.

After firing one shot at Williams, defendant stated, he saw Orlando McCoy, who had pulled something out of his pants, yelling and coming directly toward him from the front door. Defendant did not know what Orlando had pulled from his pants. Without aiming for any particular spot, defendant fired one shot at Orlando.

Defendant stated that, after shooting the two men, he "just kind of stood there for a minute." Then, according to defendant, James ran over, told defendant they had to go, and grabbed the rifle. James then turned and shot Ernestine McCoy, who was sitting on the living room couch, screaming. James again told defendant they had to leave the trailer. James then walked over to Orlando, who was by the front door, and shot him. James then shot Stanley Williams, who was lying on the kitchen floor. After firing the three shots, James yelled at defendant to "come on" and then left the trailer. Defendant stated that he remained in the trailer, scared, and not knowing what to do. James came back in, grabbed defendant by the arm, and said they had to leave.

When defendant got back to Daubach's car, he realized that the rifle was inside his coat. Defendant did not remember how the rifle got there, but guessed that James must have given it to him after the shootings. Inside the car, Daubach and Becky Williams were discussing what happened in the trailer. Defendant told them to "shut up."

Defendant testified that, after the group arrived at Daubach's house, he removed his clothes and took a shower. When he got out of the shower, defendant saw James putting his clothes into the fireplace. Defendant placed his own T-shirt in the fireplace and helped James set the clothes on fire. Defendant stated that he did not place his boots in the fire. Defendant also denied disposing of the rifle. According to defendant, Dana Ganninger took the rifle and "put [it] up" someplace. Defendant further denied taking any money, drugs or other items from Williams' trailer. Defendant also stated that he did not discuss the shootings with anyone and denied telling Ganninger that he had killed the people in the trailer.

Defendant continued to live at Daubach's house until a few days before Christmas 1995. At that time, according to defendant, he and Ganninger were preparing to visit defendant's mother in Missouri for the holidays. Before leaving, however, defendant and James argued about the shootings at Williams' trailer. Defendant told Ganninger to get the .22-caliber rifle that had been used in the shooting and to put it in the car. Defendant stated that he did not threaten anyone at that time, or tell anyone that he was going to shoot them or himself. Defendant, Ganninger, and Ganninger's two children then drove to defendant's mother's home in Missouri. Defendant stated that, as they crossed the Mississippi River bridge, he threw the rifle into the river because he "wanted no more to do with it."

After his arrest, defendant gave a statement to the police that was written down by Illinois State Police Officer Donald Stalcup. Defendant testified that he did not read the statement before he signed it because he trusted Officer Stalcup.

At trial, defendant recounted an incident that was included in the statement he had given to the police. Defendant stated that in November 1995, he and James

went to Stanley Williams' trailer to buy some drugs. At the trailer were Williams and two other individuals, Art and Boo. When defendant was told that it would take an hour to get the drugs he wanted, he reached for his money and tried to leave. However, Boo, who was standing by a pistol that was lying on the counter, said he was taking defendant's money. Williams told Boo that defendant and James were "cool," but Boo told defendant and James to leave. After talking with James, defendant left. Defendant stated that, although he had been robbed in Williams' trailer, he held no grudge against Williams. Defendant explained that Williams later tried to make up for the incident by giving defendant extra cocaine.

Defendant told the jurors that when he entered Williams' trailer on December 11, 1995, he did not intend to shoot Williams or Orlando McCoy. Defendant stated that he shot Williams because he was afraid, and because he thought Williams was going to shoot him.

On cross-examination, defendant denied being with Dana Ganninger when he met Stanley Williams for the first time, and denied telling Ganninger that Williams had an attitude problem and "was going to get it." Defendant also denied sawing off the barrel of the rifle so that he could conceal the weapon. According to defendant, he and James sawed off the barrel one day because they had "nothing better to do." Defendant testified that he did not take the rifle into Williams' trailer with the intent to shoot the victims, and stated that it was a coincidence that he stopped to pick up his rifle at Kincannon's trailer in State Park on the same day the victims were killed.

Defendant further testified, on cross-examination, that Williams was seated and had not yet opened the cabinet door at the time he was shot. When asked why he did not threaten Williams with his rifle, or hold the rifle on Williams, instead of shooting him, defendant

again stated that he was afraid. Defendant acknowledged that he did not usually go to Williams' trailer to buy drugs without James and that the only time Williams had threatened defendant, prior to the day of the shooting, James had not been present. Defendant also admitted that, while he had testified on direct examination that Williams said he was going to "shoot your ass," that threat was not in the signed statement defendant gave to the police at the time of his arrest. Defendant explained the inconsistency by saying that he did not review the statement he gave to the police when he signed it because he trusted the officer who wrote it down. Defendant further acknowledged that, after Williams told him to leave the trailer on December 11, 1995, he was tired of hearing people tell him to leave the drug house without letting him buy any drugs.

Defendant also testified that, when Orlando McCoy came toward him, he approached face-forward. Defendant was asked how, in light of this fact, Orlando received bullet wounds on both sides of his head. Defendant stated that he had "no idea." Defendant was also asked whether, given the pool of blood found by the front door, defendant was able "to shoot [Orlando] in the head, and he actually got over to the door several feet away before he dropped." Defendant replied, "I guess that's true." Defendant stated that he was "panicked" and "scared" when he shot Williams and Orlando, but also acknowledged that each victim was shot in the same part of the head. Defendant stated that the similar placement of shots was "just a coincidence."

Defendant's testimony regarding the shooting of Ernestine McCoy was impeached with the statement he gave to police at the time of his arrest. In the statement, defendant told police that after Williams and Orlando were shot, Ernestine was on the floor in the living room, trying to get under a table. According to the statement,

James then walked about five feet from Ernestine and shot her. This description of Ernestine's murder was at odds with defendant's direct testimony, in which he stated that Ernestine was sitting on the living room couch, screaming, when James grabbed the .22-caliber rifle from defendant, turned, and shot. On cross-examination, defendant testified that he did not remember telling police that Ernestine was trying to get under a table when she was shot. Defendant stated that he did not know why, after Williams and Orlando were shot, James decided to grab the rifle and shoot Ernestine.

The defense also called St. Clair County Sheriff's Drug Unit Officer Kelly Oliver, who testified that he had conducted hundreds of drug investigations. Officer Oliver stated that a drug transaction at a "crack house" can be a dangerous situation, and that people have been shot while purchasing drugs at crack houses.

In the State's rebuttal, Illinois State Police Officer Donald Stalcup testified that defendant read the statement he gave to police at the time of his arrest before he signed it.

After closing arguments, the jury returned verdicts finding defendant guilty of the intentional or knowing murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)) of Stanley Williams, Ernestine McCoy and Orlando McCoy. The jury also returned separate verdicts finding defendant guilty of the felony murder (720 ILCS 5/9—1(a)(3) (West 1996)) of the three victims for having killed the victims during an armed robbery.

No testimony was presented at the eligibility phase of defendant's capital sentencing hearing. After arguments, the jury found the defendant eligible for the death penalty based upon two statutory aggravating factors: (1) murder in the course of another felony (720 ILCS 5/9—1(b)(6) (West 1996)); and (2) murder of two or more individuals (720 ILCS 5/9—1(b)(3) (West 1996)).

At the aggravation-mitigation phase of the sentencing hearing, Stanley Williams' sister read a victim impact statement in which she described the immeasurable loss of her brother and stated that Williams was a "human being who did not deserve to be brutally murdered."

State Police Officer Donald Stalcup also testified in aggravation. Stalcup stated that defendant told him he kept the .22-caliber rifle after the December 11, 1995, shootings because he was looking for, and wished to kill, Boo, the individual who had taken his money at Williams' trailer in November 1995.

Ken Herbert, a sergeant with the St. Clair County's sheriff's department, testified that defendant was involved in a fight with other inmates while incarcerated at the county jail. Herbert also testified that defendant admitted that he had punched a fellow jail detainee in the nose in a separate incident.

Philip Syks testified that in July 1990, he was a bouncer at a bar in Madison County that defendant had frequented on several occasions. On July 28, 1990, Syks encountered defendant at a fast food restaurant after another bouncer had kicked defendant out of the Madison County bar. Syks was in a car in the restaurant's drive through lane when defendant tried to hit him through the car window with a beer bottle. Later in the evening, as Syks left a friend's house, he was attacked by defendant, defendant's nephew, and a third man. Defendant's nephew struck Syks in the head with a baseball bat. Defendant, saying that he was going to kill Syks, slashed Syks repeatedly with a machete, cutting off three of Syks' fingers. As a result of the attack, Syks was hospitalized for eight days. Syks required 2,500 stitches and surgery to reattach his fingers. Defendant pled guilty to aggravated battery for attacking Syks and was sentenced to three years in prison.

Jennifer Maness, a special agent with the Illinois

State Police, testified that defendant had been charged with a fourth murder that occurred on December 11, 1999. Maness stated that, on the afternoon of that day, defendant fatally stabbed Robert Willis following a dispute during a drug transaction. Another individual, Dwayne McLemore, was stabbed during the same incident, but survived. James Williams was present during the attacks on Willis and McLemore and testified about the attacks before the jury.

Jennifer Maness also testified that on December 23, 1995, defendant murdered 62-year-old James Greer in a dispute over possession of Greer's car. According to Maness, while Greer and defendant were riding in Greer's car, defendant hit Greer about the head, then pulled out a knife and stabbed him repeatedly in the throat. After killing Greer, defendant weighted Greer's body down with a sand bag and left the body in a creek.

Dana Ganninger, who was present during the murder of Greer, testified before the jury. Ganninger stated that she picked up Greer at a tavern on December 23 and brought him back to Dawn Daubach's house in Greer's car. At Daubach's house, defendant asked for a ride from Ganninger and Greer. Later, after an argument in the car, defendant murdered Greer. Ganninger admitted that she helped burn Greer's car, and that she fled to Missouri after the murder. Following this testimony, the State rested in aggravation.

In mitigation, the defense presented the testimony of Dr. Michael Gelbort, a neuropsychologist. Gelbort testified that he interviewed defendant on June 28, 1997, and July 19, 1997, and administered psychological tests to him. Gelbort stated that defendant was deprived of oxygen at birth and that this type of trauma is known to be a major cause of brain injury. Gelbort further noted that defendant has epilepsy and, consistent with a history of brain dysfunction, that defendant attended learning disability classes while in school.

Gelbort described defendant's nervous system as "irritable" and stated that he "acts before he thinks" because "that's the way his nervous system works." Gelbort stated that neuropsychological testing revealed that defendant had trouble inhibiting inappropriate behavior. According to Gelbort, the use of drugs, such as cocaine, exacerbates this condition. Gelbort diagnosed defendant as suffering from organic brain syndrome, organic personality syndrome, and a seizure disorder. Gelbort described defendant's condition as being treatable with medication.

St. Clair County jail correctional officer Lawrence Kaffer testified that he was in contact with defendant at the county jail for 1½ to 2 years. Kaffer stated that he had no problems with defendant and did not think he was a threat to anyone at the jail. According to Kaffer, defendant had "leader tendencies" and had been a positive influence to other inmates.

Defendant's mother, Virginia McCallister, testified that she was married at the age of 15 and never attended school. Defendant was the second youngest of her seven children. McCallister stated that defendant was hospitalized shortly after birth, suffering from pneumonia. At the age of two, defendant began having fits and spasms. Defendant was diagnosed with epilepsy, from which his father also suffered. McCallister described defendant as a clumsy child who often fell, and stated that defendant sniffed gasoline and spray paint fumes with other children. Defendant was placed in special classes for slow learners in grade school and ultimately left school in the ninth grade.

McCallister testified that her family showed defendant a lot of love and that he was never abandoned or abused. McCallister told the jurors that defendant regularly sent her pictures and letters from jail. She also told the jurors that defendant had three children, aged

18, 6 and 4, and that he was a good father. The trial court prohibited McCallister from telling the jurors that she wanted defendant to live.

Jean Mitchell stated that she was a volunteer with the Red Cross and that she tutored at the St. Clair County jail one hour a week. For 14 to 15 months, Mitchell tutored defendant one-on-one, in weekly sessions. Mitchell found defendant to be a nice person who showed concern for other inmates. Mitchell acknowledged that defendant had a temper and could be moody, but stated that she never felt threatened or frightened by him. Following this testimony, the defense rested in mitigation.

In rebuttal, the State called forensic psychiatrist John Rabun. Rabun interviewed defendant and conducted a standard psychiatric examination. Rabun testified that defendant told him he suffered from one or two seizures a year. When these seizures occurred, defendant did not fall on the floor and shake. Instead, the seizures caused thought interruptions that lasted for a couple of minutes. After these thought interruptions, defendant would regain his senses. Rabun stated that defendant clearly suffered from a seizure disorder. However, Rabun concluded that defendant did not have a serious mental condition based upon the seizures alone.

Rabun testified that defendant was taking the antidepressant drug Elavil, to help with insomnia, and Atavin, to relieve anxiety. Rabun stated that, according to the nurse at the St. Clair County jail, defendant had refused to take his antiseizure medication, Dilantin, in January 1997, and, as far as the nurse was aware, he had not taken it since then. Although he had no documented seizures while in jail, defendant told Rabun that he did have a seizure there, after which he woke up with urine on his jumpsuit.

Following arguments, the jury returned a verdict finding that there were no mitigating factors sufficient to

preclude the imposition of the death penalty. This appeal followed.

## ANALYSIS

### Trial Counsel's Failure to Request an Accomplice Witness Instruction

The Illinois pattern "accomplice witness" instruction provides:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992).

Defendant alleges that his trial counsel was constitutionally ineffective for failing to request this instruction with respect to the testimony of James Williams.

To establish a violation of the constitutional right to the effective assistance of trial counsel, a criminal defendant must show both deficient performance and prejudice resulting from counsel's error. To establish prejudice, a defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Albanese*, 104 Ill. 2d 504, 525 (1984), quoting *Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Defendant notes that the accomplice witness instruction should be given at the defendant's request if the totality of the evidence and the reasonable inferences therefrom establish probable cause to believe that the witness participated in the crime, either as a principal or under a theory of accountability. *People v. Henderson*, 142 Ill. 2d 258, 314-15 (1990). Further, if the probable

cause test is satisfied, the accomplice witness instruction must be given, even if the witness himself denies involvement in the crime. *Henderson*, 142 Ill. 2d at 315; *People v. Carreon*, 162 Ill. App. 3d 990, 993-94 (1987). Defendant maintains that the totality of the evidence presented at trial was sufficient to establish probable cause that James Williams participated in the murders of Stanley Williams, Ernestine McCoy and Orlando McCoy either as a principal or under a theory of accountability. Defendant, therefore, contends that he was entitled to the accomplice witness instruction and that his trial counsel was deficient for failing to tender the instruction.

Defendant also contends that, because of the nature of the evidence presented at trial, he was prejudiced by his trial counsel's failure to tender the accomplice witness instruction. Defendant maintains that the trial was essentially a credibility contest between himself and James Williams. Defendant contends that if the jurors had been instructed on the suspect nature of James Williams' testimony, they would likely have rejected that testimony. And, according to defendant, if the jurors had rejected James' testimony, they would have either acquitted defendant of all charges, based on a finding that he shot Stanley Williams and Orlando McCoy in self-defense (720 ILCS 5/7—1 (West 1996)), or, at most, convicted him of the second degree murder of Williams and Orlando for the unreasonable use of deadly force in self-defense (720 ILCS 5/9—2(a)(2) (West 1996)). Thus, defendant maintains that trial counsel's performance was both deficient and prejudicial and, therefore, that he was denied the effective assistance of trial counsel.

We disagree. Even if we assume that trial counsel's failure to request the accomplice witness instruction amounted to deficient performance, we conclude that defendant has failed to establish a reasonable probability that the result of the trial would have been different had

the instruction been given. We base this conclusion on the inherent weaknesses of defendant's own testimony, the strength of the evidence offered against defendant apart from James Williams' testimony, and the instructions actually received by the jury.

Defendant's testimony regarding the events that took place inside Stanley Williams' trailer on December 11, 1995, was, in many respects, not credible. Defendant admitted, in the first instance, that he entered Williams' trailer with a loaded, sawed-off, .22-caliber rifle concealed within his trench coat. Defendant further admitted that he shot Williams in the head even though Williams was unarmed, was seated, had made no physical attack on defendant, and had not yet opened the kitchen cabinet in which he kept his inoperable gun. To justify this shooting, *i.e.*, to establish that he acted in reasonable or unreasonable self-defense, defendant testified to the existence of two facts, both of which were problematic. First, defendant stated that Williams had previously threatened him with the gun which he kept in the kitchen cabinet. However, that threat occurred, in defendant's words, on one of the "very seldom" occasions when defendant went to Williams' trailer by himself. Because of this, defendant was unable to offer any evidence at trial to corroborate his self-serving testimony regarding the existence of the prior threat. Second, defendant claimed that, just before he reached for the kitchen cabinet, Williams said he was going to "shoot [defendant's] ass." However, this threat was not mentioned in the signed statement that defendant gave to police at the time of his arrest. Thus, significant doubt was cast on the existence of a fact which was critical to establishing that defendant had a reason to fear Williams.

Further, defendant stated that he was afraid and panicking when he shot Williams, and that, when he shot Williams, he did not aim for any particular spot on Wil-

liams' body. Yet, the forensic evidence showed that, despite his panic, defendant managed to fire a single shot into Williams' temple. As the State pointed out at trial, a murder committed with a single shot to the head is frequently described by law enforcement officers as an "execution style" murder. Defendant's explanation for the location of the shot was that it was simply a "coincidence."

Defendant's testimony regarding the shooting of Orlando McCoy also lacked credibility. Defendant stated that, as Orlando attacked, he pulled "something" out of his pants that was, presumably, a weapon. That Orlando was armed with a weapon was, again, crucial for establishing defendant's contention that he shot Orlando in self-defense. However, the weapon that was discovered under Orlando's body was not a switchblade, or a handgun, or other small weapon that might typically be carried in one's pants, but rather a large kitchen carving knife. As the State argued to the jury, this fact suggested that defendant found the knife in the kitchen after the murders occurred and placed it under Orlando's body.

More importantly, defendant's testimony regarding Orlando's murder was at odds with the physical evidence. Defendant testified that Orlando was moving toward the kitchen when he was shot. Yet, the pool of blood abutting the front door of the trailer, and the drag marks in the blood leading to Orlando's body, established that, after Orlando was shot, his head landed on the floor next to the front door. When asked, defendant agreed that Orlando must therefore have walked the "several feet" from the kitchen to the front door after being shot in the head. As the State noted at trial, defendant's testimony was incredible, as it is highly unlikely that Orlando could have walked several feet after being shot directly in the temple.

Defendant also testified that Orlando was facing him

straight on when he attacked. However, the forensic evidence showed that Orlando was shot in the side of the head, not in the front. When defendant was asked how Orlando could have been shot in the side of the head if he was attacking defendant face-forward, defendant said only that he had "no idea." As with the shooting of Williams, defendant stated that he was panicking and afraid when Orlando was approaching. Yet, as with Williams, defendant managed to fire a single shot, execution style, into Orlando's head. Again, defendant's explanation for the placement of the shot was that it was a "coincidence."

Defendant's testimony was also weak with respect to the shooting of Ernestine McCoy. According to the forensic evidence presented at trial, Ernestine was shot once in the back of the neck. The bullet that entered Ernestine's neck traveled forward and downward. This evidence was consistent with defendant's testimony that James, while standing with defendant in the kitchen, grabbed the rifle from defendant and then shot Ernestine from behind as she sat on the couch. However, defendant also testified that Ernestine was screaming when she was shot. Thus, according to defendant's version of events, Ernestine must at least have been aware that shots had been fired, if not the fact that Williams and Orlando had each just been shot in the head. Yet, according to defendant's testimony, Ernestine was not trying to flee the trailer or protect herself when she was shot but, instead, was sitting on the couch with her back to the people doing the shooting. Further, as the State pointed out at trial, if defendant had, in fact, shot Williams and Orlando in self-defense, there would have been no need to shoot Ernestine, who posed no threat to defendant or James. At trial, defendant offered no explanation for why James grabbed the rifle and, without deliberation, shot a woman who posed no threat to them.

Equally important, defendant's testimony regarding Ernestine's murder was impeached with the statement he gave the police at the time of his arrest. In that statement, defendant said that Ernestine was not on the couch, but was on the floor of the living room, trying to get under a table, when she was shot by James Williams from about five feet away. Because of this impeachment, doubt was again cast on a critical portion of defendant's testimony.

Furthermore, defendant's statement to police describing Ernestine's murder was, itself, not credible. The living room in Williams' trailer contained a coffee table, set in the middle of the room, and a small end table, set against the wall opposite the front door. Pictures taken of the trailer show that none of the numerous items on the tables, including vases with flowers, a purse, a cup, and other miscellaneous items, were disturbed. As the State argued to the jury, if Ernestine had tried to protect herself from her attackers by hiding under one of the tables, she would surely have knocked over, or disturbed in some way, the items on top of the table. Further, there was no blood on either of the tables, a fact at odds with the assertion that Ernestine was shot while hiding under one of them. Moreover, the position of Ernestine's body was inconsistent with defendant's statement. Ernestine's body was not found under one of the tables, but was found directly in front of the living room couch.

Defendant's testimony regarding the events that took place inside Williams' trailer may not have been so incredible as to be completely unworthy of belief, but, considered solely on its own terms, it was problematic. As the State argued at length before the jury, the most critical portions of defendant's testimony were uncorroborated, were impeached, or were inconsistent with the physical evidence. Clearly, the outcome of defendant's trial depended as much upon whether the jury believed

defendant as it did upon whether they believed James Williams. Equally as clear, in finding defendant guilty of the murders of Stanley Williams, Orlando McCoy and Ernestine McCoy, the jurors, in fact, rejected defendant's testimony. If the accomplice witness instruction had been given, it would have done nothing to cure the inherent weaknesses of defendant's testimony and nothing to increase the likelihood of its acceptance by the jury.

If given, the accomplice witness instruction would also have had no effect on the jury's assessment of the witnesses, other than James Williams, presented by the State. Dawn Daubach, Becky Williams and Dana Ganninger testified at trial against defendant. Daubach and Becky both testified that, while waiting outside Williams' trailer, they heard three shots fired in quick succession, followed by a short pause, and then two more shots. This sequence of shots corroborated James Williams' testimony regarding how the shootings took place. In addition, Daubach and Becky both testified that, when James exited the trailer, he was shocked and physically ill. Again, as the State argued to the jury, this tended to corroborate James's testimony that he did not expect the shootings or participate in them. Dana Ganninger's testimony further corroborated James Williams' version of the shootings. Ganninger testified that, in November 1995, defendant told her that Stanley Williams had an attitude problem and was "going to get it." She also stated that, on the afternoon of December 11, 1995, defendant confessed to killing the three victims.

Defendant notes that the testimony of Becky, Daubach and Ganninger was not entirely credible. Both Daubach and Ganninger had prior felony convictions, and all three witnesses admitted being addicted to, or frequently using, cocaine around the time of the murders. However, the testimony of Becky, Daubach and Ganninger was not discredited to the extent that defendant's

testimony was. Moreover, the testimony of each of these witnesses was consistent with the others' in all important respects. As the State noted at trial, this tended to reduce the likelihood that the witnesses had fabricated their testimony. The combined strength of Becky's, Daubach's and Ganninger's testimony was considerable. The accomplice witness instruction, if given, would have had done nothing to diminish the weight of this testimony.

Lastly, we note that the jury in the case at bar received the general, pattern instruction on witness credibility. See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed. 1992). This instruction tells the jurors that "[i]n considering the testimony of any witness, [they] may take into account *** any interest, bias, or prejudice he may have." Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed. 1992). Thus, while the jury in this case did not receive the accomplice witness instruction with respect to James Williams, it did consider, in general terms, any "interest, bias or prejudice" that James Williams had in testifying as he did.

Defendant argues, however, that the general instruction on witness credibility that was given to the jury did not cure the omission of the accomplice witness instruction. Defendant maintains that the general instruction speaks only in neutral terms while, in contrast, the accomplice witness instruction pointedly tells the jurors to view the testimony of the accomplice with "suspicion" and "caution." According to defendant, the general instruction is distinct from, and cannot function as a substitute for, the accomplice witness instruction.

We agree that the general instruction on witness credibility may not, *by itself*, be enough to cure an errant omission of an accomplice witness instruction. Otherwise, the accomplice witness instruction would be rendered essentially meaningless, since the general instruction on witness credibility is given in most criminal cases. In this

case, however, we believe that the fact that the jury was told to consider, in general, the bias, interest or prejudice of the witnesses may be considered as one factor, *among others*, which establishes that defendant was not prejudiced by his trial counsel's failure to tender the accomplice witness instruction.

Defendant also argues that the facts of this case are analogous to those in *People v. Campbell*, 275 Ill. App. 3d 993 (1995), in which the appellate court concluded that a defendant's trial counsel was constitutionally ineffective for failing to request an accomplice witness instruction. Defendant urges us to follow the reasoning of the *Campbell* decision.

In *Campbell*, the defendant was convicted of burglary and criminal damage to property for breaking into a church and spraying the interior with a fire extinguisher. Two other individuals who were charged in the offense testified for the State at trial. The two State witnesses acknowledged at trial that their testimony was given in exchange for receiving a lesser sentence or for the dismissal of charges relating to the damage done to the church. The two witnesses also testified that the defendant had entered the church and sprayed the interior of the church with the fire extinguisher. The two witnesses denied, however, doing any damage to the church themselves. Defendant, in turn, testified that he did not enter the church and that the two State witnesses were the ones who sprayed the church with the fire extinguisher. Neither the defendant's testimony nor the accomplices' testimony was at odds with the physical evidence, or was impeached with prior inconsistent statements. *Campbell*, 275 Ill. App. 3d at 995. On these facts, the appellate court concluded that the evidence in defendant's case was closely balanced and that trial counsel's failure to tender the accomplice witness instruction with respect to the two witnesses denied the defen-

dant the right to effective assistance of counsel. *Campbell*, 275 Ill. App. 3d at 999.

We find *Campbell* readily distinguishable from the present case because the facts in *Campbell* were more closely balanced than those in the case at bar. Unlike the defendant's testimony in *Campbell*, defendant's testimony in this case was replete with objectively discernable weaknesses, including prior inconsistent statements, critical facts that were uncorroborated, and assertions that were at odds with the physical evidence. In addition, the two State witnesses in *Campbell* admitted that their testimony was offered in exchange for leniency from the State for the same incident in which the defendant was charged. None of the witnesses in the case at bar testified to a similar situation. Further, in *Campbell*, the only witnesses who testified that the defendant damaged the church were the two accomplice witnesses. In the case at bar, three witnesses who were not accomplices, Becky Williams, Dawn Daubach and Dana Ganninger, testified to facts that established defendant shot and robbed the victims. For these reasons, we do not find *Campbell* persuasive authority in this appeal.

The facts in the case at bar are not so closely balanced that we can say our "confidence in the outcome" (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068) has been undermined by trial counsel's failure to request the accomplice witness instruction. The inherent weaknesses in defendant's testimony, the evidence aligned against defendant apart from James Williams' testimony, and the fact that the jury did consider James' bias, interest and prejudice in general terms together establish that there is no reasonable probability that the outcome of the trial would have been different had the accomplice witness instruction been given. Accordingly, we hold that trial counsel was not constitutionally ineffective for failing to request the accomplice wit-

ness instruction with respect to the testimony of James Williams.

Exclusion of Statement Against Penal Interest

At the close of the State's case in chief, the defense sought to introduce, through defendant's sister, Sharon Lee, a hearsay statement made by James Williams. In an offer of proof, defense counsel asserted that Lee would testify that, on December 15, 1995, four days after the murders, she received a phone call from James Williams. According to Lee, James identified himself and asked to speak with Julie Santin, a former girlfriend of defendant. James asked Lee if she were Santin and Lee falsely answered "yes." James then told Lee, whom he thought was Julie Santin, that he and defendant were "in trouble." James said, "Maynard shot two people and I had to get rid of the witnesses. We need to see you right away."

The trial court sustained the State's objection to Lee's testimony. The court noted that the hearsay statement was against James' penal interest and that James was available to testify. However, in the court's view, the statement was not made spontaneously to a close acquaintance and was not corroborated by other evidence. Under these circumstances, the court ruled that, pursuant to *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049 (1973), James' purported statement did not meet the criteria for admission under the statement-against-penal-interest exception to the hearsay rule. Defendant now maintains that the trial court's ruling was in error and impaired defendant's fundamental constitutional right to present a defense.

The State initially maintains that this claim is procedurally defaulted because it was not included in defendant's post-trial motion. We will consider the claim, however, because it concerns defendant's due process

right to present a defense and because the claim was raised by the defense at trial. See *People v. Enoch*, 122 Ill. 2d 176, 190 (1988) (exception to the requirement that issues must be preserved in a post-trial motion exists for "constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction hearing petition").

In general, a declarant's unsworn, out-of-court statement that he committed the crime for which a defendant is charged is inadmissible hearsay, even though the statement is against the declarant's penal interest. *People v. Tate*, 87 Ill. 2d 134, 143 (1981). However, such a statement may be admitted under the statement-against-penal-interest exception to the hearsay rule if the statement contains sufficient indicia of reliability and if justice so requires. *People v. Bowel*, 111 Ill. 2d 58, 66 (1986), citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049 (1973) ("the hearsay rule may not be applied mechanistically to defeat the ends of justice"). To determine whether a statement contains sufficient indicia of reliability, courts look foremost to whether the statement is self-incriminating and against the declarant's interest. *People v. Keene*, 169 Ill. 2d 1, 29 (1995). Courts also look to whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; whether the statement was corroborated by other evidence; and whether there was adequate opportunity for cross-examination of the declarant. These latter factors are not "hard and fast requirements" for admissibility but, instead, are simply "indicia" of trustworthiness. *People v. House*, 141 Ill. 2d 323, 390 (1990), citing *Bowel*, 111 Ill. 2d at 67; *Keene*, 169 Ill. 2d at 29. In every case, the ultimate question in deciding the admissibility of the hearsay declaration is whether it was "made under circumstances which provide 'considerable assurance' of its reliability by objec-

tive indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. Whether a statement is admissible under the statement-against-penal-interest exception to the hearsay rule rests within the sound discretion of the trial court. *Bowel*, 111 Ill. 2d at 68.

Defendant concedes that the hearsay statement purportedly made by James Williams was not made to a close acquaintance. Defendant maintains, however, that the statement was against James Williams' penal interest, that it was made spontaneously, and that it was corroborated by other evidence. The State concedes that the statement was against James' interest, and that James was available to testify, but challenges whether the statement was made spontaneously and whether it was corroborated by other evidence. We believe that, because of a lack of corroborative evidence, the trial court did not abuse its discretion in excluding the hearsay statement.

The hearsay statement at issue in this case is a single, unsworn, oral declaration purportedly made to defendant's sister by James Williams. At the time defendant's trial counsel moved to have the hearsay statement admitted, James Williams had completed his sworn testimony for the State. In that testimony, James admitted that he was present at Williams' trailer at the time of the shootings and that he fled the trailer with defendant. As defendant points out, these facts tend to corroborate the hearsay statement. See, *e.g.*, 2 J. Strong, McCormick on Evidence § 319(e), at 328-29 (5th ed. 1999) (presence of declarant at crime scene corroborative). However, in his testimony, James denied knowing that defendant had taken a rifle into the trailer, denied knowing that the shootings were going to take place, and specifically denied shooting or killing anyone in the trailer. This testimony was subsequently corroborated by three State witnesses, Becky Williams, Dawn Daubach and Dana Ganninger, all

of whom offered testimony that pointed only to defendant as the killer of the three victims. Thus, at the time defendant moved to have the hearsay declaration admitted, evidence had been introduced which established that James was present at the trailer during the murders. However, no evidence put James in possession of the .22-caliber rifle and no evidence pointed to James as the murderer. Further, in contrast to the evidence that defendant said Williams had an "attitude problem" and was "going to get it," no evidence had been introduced for why James would shoot the victims.

Given the foregoing facts, we must conclude that the circumstances known to the trial court at the time defense counsel moved to have the hearsay statement admitted did not provide " 'considerable assurance' " (*Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49) of the statement's reliability (*cf. Chambers*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (hearsay statements in which the declarant confessed to a murder were reliable where, *inter alia* the declarant signed a sworn, written confession to the murder that was repudiated before trial, eyewitness testimony indicated that the declarant committed the murder, and other evidence corroborated the statements)). Accordingly, we cannot say that the trial court abused its discretion in excluding the hearsay statement, or that the statement's exclusion "defeat[ed] the ends of justice." *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

Defendant argues, however, that the motion to admit the hearsay statement should have been renewed at the close of defendant's case. Defendant maintains that, after he testified, overwhelming corroboration existed, via his own testimony, to allow the admission of the hearsay statement. Therefore, defendant argues, trial counsel was ineffective for not renewing the motion at the conclusion of his testimony.

We disagree. To establish a claim of ineffective assistance of counsel, defendant must show that trial counsel's failure to renew the motion was professionally deficient and that there is a reasonable probability that the trial court would have granted the motion to allow the hearsay statement had the motion been renewed at the conclusion of defendant's testimony. We have previously noted the many "objective indicia" (*Bowel*, 111 Ill. 2d at 67, citing *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49) of weaknesses in defendant's testimony. These objective weaknesses undermine the corroborative value that the trial court might have given defendant's testimony. We note too that, even if defendant's testimony is accepted as completely credible, it does not, as defendant suggests, fully establish the trustworthiness of the hearsay statement. In the hearsay declaration, James Williams allegedly said that he had to "get rid of the witnesses" after defendant "shot two people." A criminal, of course, speaks of getting "rid of the witnesses" when covering up some nefarious activity. Defendant testified, however, that Williams and Orlando threatened and attacked him, and that he shot them only in self-defense. The assertion that James said he had to "get rid of the witnesses" therefore makes little sense, as, according to defendant's own testimony, there was no illegal activity that had to be concealed.

Furthermore, before defendant took the stand, defense counsel called James Williams to testify. During his brief testimony, James was specifically asked about defendant's sister, Sharon Lee, and defendant's former girlfriend, Julie Santin. James testified that he never spoke with Lee and that he never attempted to contact Santin. This testimony further underscored the lack of corroborating circumstances before the trial court at the conclusion of defendant's testimony. *Cf. People v. Swaggirt*, 282 Ill. App. 3d 692 (1996) (declarant's hearsay

statements confessing to attack corroborated where declarant did not testify as to whether he made the statements, and where multiple defenses witnesses testified that the declarant was present at the crime scene with the weapon used in the attack, one witness saw someone who looked like the declarant strike the victim, and the declarant had a motive for the attack).

In light of the foregoing, we conclude that there is no reasonable probability that, had defense counsel renewed the motion to allow the admission of the hearsay statement at the conclusion of defendant's testimony, the trial court would have reversed its prior ruling and allowed the motion. Consequently, we hold that defense counsel was not ineffective for failing to renew the motion.

### Error in Death-Eligibility Verdict Forms

Defendant was found death eligible based on two statutory aggravating factors: (1) murder in the course of another felony (720 ILCS 5/9—1(b)(6) (West 1996)); and (2) murder of two or more individuals (720 ILCS 5/9—1(b)(3) (West 1996)). Defendant contends that the verdicts returned by the jury on these two factors were legally insufficient because they omitted the mental state necessary to support a finding of death eligibility.

The felony-murder aggravating factor requires, as an element of death eligibility, that the defendant "acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(6)(b) (West 1994). Similarly, the multiple-murder aggravating factor provides for death eligibility where, *inter alia*, "the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(3) (West 1994).

In the case at bar, the eligibility verdict forms returned by the jury omitted the necessary finding regarding defendant's mental state. The felony-murder verdict states:

"We the jury unanimously find beyond a reasonable doubt that the defendant, Maynard McCallister, Jr., is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

(1) the defendant was 18 years or older at the time of the murders for which he was convicted in this case; and

(2) the following statutory aggravating factor exists:

The murdered person(s) was killed in the course of another felony, Armed Robbery."

The multiple-murder eligibility verdict is identical, except that the last line reads: "The defendant has been convicted of killing two or more persons." Defendant maintains that, pursuant to *People v. Mack*, 167 Ill. 2d 525 (1995), these verdict forms were legally insufficient. As a result, according to defendant, there has been no finding that defendant is eligible for the death penalty under Illinois law.

Defendant concedes that no objection was made to the verdict forms at trial. Defendant argues, however, that the use of the defective verdict forms constituted plain error and that, in addition, trial counsel was ineffective for failing to object to the verdict forms.

We agree that pursuant to *Mack* and its progeny (see, *e.g.*, *People v. Buss*, 187 Ill. 2d 144, 223-25 (1999); *People v. Macri*, 185 Ill. 2d 1, 58 (1998); *People v. Jackson*, 182 Ill. 2d 30, 68 (1998)), the death eligibility verdicts were deficient. We do not believe, however, that under the facts of this case, the use of the forms constituted plain error or that trial counsel was ineffective for failing to object to those forms.

In *Mack*, the defendant was convicted of murder in a bench trial. The sentencing hearing was conducted before a jury. At the conclusion of the sentencing hearing, the jury returned a felony-murder eligibility verdict that

omitted the required *mens rea.* Examining the validity of the jury's eligibility verdict, we noted the critical importance of the mental state finding to establishing a valid death-eligibility verdict. *Mack,* 167 Ill. 2d at 533. We also noted that the process of interpreting a jury's verdict "should not become a speculative attempt to reconstruct the jury's deliberations and divine its unexpressed conclusions." *Mack,* 167 Ill. 2d at 536-37. Because the jury in *Mack* never expressed a conclusion as to whether the defendant possessed the required mental state, the eligibility verdict was legally insufficient. *Mack,* 167 Ill. 2d at 538.

We further noted, in *Mack,* the unavailability of harmless error analysis to cure the eligibility verdict (*Mack,* 167 Ill. 2d at 539). Subsequent cases have established the inappropriateness, under the due process clause, of this court independently making a determination that a defendant is death eligible. *People v. Shaw,* 186 Ill. 2d 301, 344 (1998) (under the Illinois death penalty statute, if a defendant elects to have a jury perform the sentencing function, the defendant has a protected liberty interest in having the jury determine death eligibility); *People v. West,* 187 Ill. 2d 418, 445-46 (1999) (same).

In the case at bar, unlike in *Mack,* the same jury which found defendant death eligible also heard the guilt-innocence phase of defendant's trial. And, at the conclusion of the guilt-innocence phase, the jury returned verdicts finding defendant guilty of the intentional or knowing murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)) of Stanley Williams, Ernestine McCoy and Orlando McCoy. Thus, the principal concerns animating our decision in *Mack* are not present in the case at bar. We need not speculate as to whether the jury found that defendant acted with the requisite *mens rea* because the jury did, in fact, make that determination at the guilt-

innocence phase of trial. Nor do we need to substitute our judgment for that of the jury to find the defendant death eligible because, again, the jury made the requisite finding regarding defendant's *mens rea*. Consequently, although the omission of the mental state from the eligibility verdicts was error, we cannot say that the omission was so fundamental a defect that it amounted to plain error. *People v. Childress*, 158 Ill. 2d 275 (1994) (omission of mental state from felony-murder eligibility verdict not reversible error where same jury returned finding at guilt phase that defendant was guilty of knowing or intentional murder).

Defendant argues, however, that under the eighth amendment and the Illinois death penalty statute, capital defendants are entitled to have the jury make the necessary findings to support death eligibility at the sentencing hearing, regardless of what findings are made at trial. Otherwise, defendant argues, eligibility hearings would be rendered meaningless and unnecessary in many cases. For example, according to defendant, no eligibility hearing would be necessary for a defendant convicted at trial of the intentional or knowing murder of more than one person, because those trial findings are all that are needed to establish death eligibility under the multiple-murder aggravating factor (720 ILCS 5/9—1(b)(3) (West 1994)).

The Illinois death penalty statute requires eligibility hearings in every capital case. We do not hold, in this case, that eligibility hearings are ever unnecessary. Instead, our holding is simply that, in this case, because the same jury heard both the guilt-innocence phase and sentencing phase of trial, and because that jury returned an unequivocal finding of the requisite *mens rea* at the guilt-innocence phase of trial, the omission of that *mens rea* from the eligibility verdict is not so fundamental a defect that it constitutes plain error. We also hold that,

because the jury did, in fact, find the necessary mental state to sustain defendant's death eligibility, there is no reasonable probability that the outcome of the eligibility hearing would have been different had trial counsel objected to the verdict forms. Accordingly, we hold that trial counsel was not constitutionally ineffective for failing to object to the eligibility verdict forms.

### Trial Court's Failure to *Sua Sponte* Order an Inquiry Into Defendant's Fitness to Stand Trial or Be Sentenced

Prior to trial, defense counsel asserted that defendant was receiving psychotropic medication and that he had a history of head injuries and seizures that could affect his fitness to stand trial. Counsel averred that he had a *bona fide* doubt as to defendant's fitness to stand trial and requested that the issue be decided by a jury. The trial court granted the request and set the matter for hearing. Experts were appointed to examine defendant.

On August 29 and 30, 1996, a jury fitness hearing was held. The sole witness for the State, clinical psychologist Dr. Daniel Cuneo, testified that defendant had a history of headaches beginning at age 5, and a history of seizures beginning at age 12. Cuneo estimated that defendant's IQ was in the "dull normal" range. Cuneo also noted defendant's chronic abuse of drugs and his history of blackouts. Cuneo concluded that defendant suffered from poly-substance dependence, a personality disorder "not otherwise specified," a seizure disorder, and an antisocial personality disorder.

Cuneo also testified that at the St. Clair County jail, defendant was being given the antidepressant drug Elavil and the anticonvulsive drug Dilantin. During Cuneo's cross-examination, the following exchange took place.

"[Assistant Public Defender:] Last area of inquiry I'd like to ask you about, Doctor, is you testified to this jury in

your opinion you thought that [defendant] was fit, and I'd like to ask you specifically whether because of the history of seizures, the Elavil and the Dilantin that he's taking on a daily basis, whether or not he's a type of individual that would be more appropriately fit with special provisions?

[Dr. Cuneo:] He's going to have to remain on the Dilantin. The issue there is you may wish to have a medical doctor make that decision, and I state that you may want to have a neurologist come in, and I state that because he has been seizure free, according to [defendant], for three to four years.

At the same time, he's been on the Dilantin. If he didn't take his Dilantin, he would suffer seizures. If he suffered seizures, he would be unable to continue with the trial. He would also, I don't know, seizure [sic] he'd be unable to recall what's going on at that time.

So, he would need to be on the medication, but I would think that the best individual to make that decision would be a physician.

Q. Well, Doctor, are you saying that you don't have enough information to render an opinion in that regard? You don't feel you're well qualified in that area or that there would have to be further testing done?

A. I'm stating that he's fit on the medication he is on. I would strongly recommend that he continue with the Dilantin.

Q. What if he were taken off the medication?

[Assistant State's Attorney:] Objection, your Honor. That's irrelevant.

THE COURT: Sustained."

At the conclusion of defendant's fitness hearing, the jurors found defendant fit to stand trial. Defendant's murder trial and capital sentencing hearing subsequently took place in late July 1997, 11 months after his fitness hearing. On July 29, during the State's rebuttal aggravation, Dr. John Rabun, a forensic psychiatrist, testified that the nurse at the St. Clair County jail informed him that defendant refused to take his Dilantin in January 1997, and that, as far as the nurse was aware, defendant had not taken the medication since then. Rabun also

testified that defendant told him he had suffered a seizure while at the county jail.

Defendant now maintains that Cuneo's testimony at the fitness hearing established that defendant was fit to stand trial only because he was taking his prescribed antiseizure medication, Dilantin, and that defendant would remain fit only if he continued to take the medication. Defendant further maintains that Rabun's testimony established that, for six months prior to his trial and sentencing hearing, defendant had not been given the medication that was a prerequisite to his remaining fit. Defendant also observes that, when Rabun testified regarding the nurse's statement that defendant had not been taking his Dilantin, neither the trial court nor defense counsel took any steps to ensure that defendant had not been rendered unfit during his trial and death penalty hearing. Defendant maintains that this failure deprived defendant of his right to due process of law. Defendant also contends that, because there was testimony that, without the Dilantin, defendant could suffer a type of seizure such that others would not know he had lost awareness of what was going on around him, the failure to *sua sponte* inquire into his fitness violated his right to be present at trial and sentencing.

A defendant is presumed fit to stand trial. 725 ILCS 5/104—10 (West 1994). A defendant is entitled to a fitness hearing only when a *bona fide* doubt of his fitness to stand trial or be sentenced is raised. *People v. Johnson*, 183 Ill. 2d 176, 193 (1998). The *bona fide* doubt inquiry is focused primarily on whether the defendant is able to understand the nature and purpose of the proceedings and to assist in his defense. *Johnson*, 183 Ill. 2d at 193. Because it is a violation of due process to convict a defendant who is mentally unfit to stand trial, a judge has a duty to order a fitness hearing *sua sponte* once facts are brought to the judge's attention that raise a *bona fide*

doubt of the accused's fitness to stand trial or be sentenced. *People v. Murphy*, 72 Ill. 2d 421, 430 (1978).

In this case, defendant's sole basis for contending that an inquiry should have been made into his fitness following Rabun's testimony is that defendant had not been taking a prescribed antiseizure medication, Dilantin, between January 1997 and late July 1997. This assertion is not supported by the record. On seven separate occasions, from January 2, 1997, through July 21, 1997, during various court appearances, defendant was questioned by the trial court regarding his ability to understand the court proceedings and assist his trial counsel. On at least four of these occasions, January 22, July 2, July 18 and July 21, defendant stated that he was taking Dilantin for his seizures. Typical of the colloquies which occurred on these occasions is the following exchange that took place on July 18, 1997:

"THE COURT: And we've gone through this before, but you read, write, and understand the English language?

THE DEFENDANT: Yes, sir.

THE COURT: You're not under the influence of any drugs or alcohol today that would prevent you from understanding what's going on?

THE DEFENDANT: No, sir.

THE COURT: Are you taking any medication?

THE DEFENDANT: Yes, Dilantin.

THE COURT: That's for seizures?

THE DEFENDANT: Yes.

THE COURT: For mood swings and so forth?

DEFENDANT: Yeah.

THE COURT: But that doesn't affect your ability to communicate with your lawyer or understand what's going on, does it?

DEFENDANT: No, sir."

The record thus indicates that defendant told the trial court that he was taking Dilantin during the very time that defendant now asserts that he was not taking the medication. The only evidence offered by defendant

to support his contention that he was not taking Dilantin is the hearsay statement from the jail nurse. There are no medical reports in the record that indicate defendant was not taking Dilantin, and defendant points to no other facts in the record that suggest a *bona fide* doubt as to his fitness to stand trial or sentencing.

From January 1997 through July 1997, the trial court repeatedly and scrupulously questioned the defendant regarding the medications he was ingesting, his awareness of the court proceedings and his ability to assist his trial counsel. During this time, defendant expressly informed the trial court that he was taking Dilantin. On this record, therefore, we cannot say that the trial court erred when it did not *sua sponte* inquire into defendant's fitness following Rabun's testimony.

Mitigation Testimony of Defendant's Mother

Defendant's mother, Virginia McCallister, testified on behalf of defendant during the aggravation-mitigation phase of sentencing. Near the conclusion of McCallister's direct examination by defense counsel, the following exchange occurred:

"Q. Mrs. McCallister, do you love your son?

A. Yes I do sir. I love all my children.

Q. And you sat here, and you've heard what just—what this jury has convicted him of. Has that changed your love for him?

A. God knows it don't. I'm a little more—I always showed Maynard a little more attention than I did the rest of the children because Maynard always had a problem, and I knew it.

Q. Mrs. McCallister, do you want your son to live?

[Assistant State's Attorney:] Objection, Your Honor. That is irrelevant. That has—

A. With all my heart.

THE COURT: Sustained.

A. With all my heart. Please do not because I've lost his father. I've lost a—

[Assistant Public Defender:] Mrs. McCallister.

[Assistant State's Attorney:] That's a violation of the Court Order.

THE COURT: I sustain the objection."

Defendant argues that the trial court's ruling excluding McCallister's testimony violated defendant's rights under the eighth and fourteenth amendments to a fair and reliable death penalty hearing. Defendant concedes that this court has held that "a witness' opinion that a defendant should not be sentenced to death is not admissible at a capital sentencing hearing." *People v. Howard*, 147 Ill. 2d 103, 162 (1991). Defendant maintains, however, that there is a difference between a witness' opinion about what sentence a defendant deserves, and a witness' personal feeling that she wants the defendant to live. The former, according to defendant, is an inadmissible expression of opinion on the ultimate question for the sentencer. The latter, defendant argues, is an expression of the witness' feeling that she does not want her relationship with the defendant severed by his death, and constitutes relevant mitigating evidence of the defendant's character. Thus, according to defendant, McCallister should have been allowed to testify that she wanted defendant to live.

Assuming, without deciding, that defendant's rationale is correct, and that it was error to exclude McCallister's testimony, we find any such error harmless beyond a reasonable doubt. The aggravating evidence introduced against defendant during the sentencing hearing was overwhelming. That evidence showed, *inter alia*, that defendant was involved in an incident in which he attacked a man with a machete; that on the same day defendant murdered the three victims in this case, he attacked one man and murdered another during a drug dispute; and that, approximately two weeks after defendant murdered the three victims in this case, he murdered another man following an argument over his car. Furthermore, it cannot be seriously argued that the jury in this case was un-

aware that McCallister, defendant's mother, wanted defendant to live. Given these facts, we hold that, even assuming it was error to exclude McCallister's testimony, such error could not have contributed to the imposition of the death sentence and was harmless beyond a reasonable doubt. See *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981) (setting forth the approaches for measuring whether error is harmless beyond a reasonable doubt).

Constitutionality of the Death Penalty Statute

Defendant asserts that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant that precludes meaningful consideration of mitigation; that the statute is unconstitutional because it allows the sentencer to weigh a vague aggravating factor; that the statute is unconstitutional because it fails to sufficiently minimize the risk that death sentences will be arbitrarily imposed; and that the statute is unconstitutional because of the inevitability that the death penalty will be applied to innocent persons. Each of these contentions has been rejected by this court, and we decline to revisit our holdings on these issues. *People v. Taylor*, 166 Ill. 2d 414, 439-40 (1995) (and cases cited therein); *People v. Munson*, 171 Ill. 2d 158, 203-06 (1996); *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998).

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed. The clerk of this court is directed to enter an order setting Thursday, November 30, 2000, as the date on which the sentence of death entered in the circuit court is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of

Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Judgment affirmed.*

JUSTICE BILANDIC, specially concurring:

Defendant contends that, pursuant to *People v. Mack*, 167 Ill. 2d 525 (1995), his death-eligibility verdict forms were legally insufficient. I reject this argument for the reasons explained below.

*Mack* is distinguishable from this case. In *Mack*, the defendant was found guilty of murder and armed robbery at a bench trial. A jury was empaneled for the death penalty hearing. The jury was properly instructed to determine whether the defendant was eligible for the death penalty solely on the basis of the statutory aggravating factor of murder in the course of another felony (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)). The jury returned a verdict finding the defendant eligible for the death penalty. The eligibility verdict form read: " 'We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.' " *Mack*, 167 Ill. 2d at 529-30. The defendant alleged in his post-conviction petition that appellate counsel was ineffective for not raising on direct appeal that the death-eligibility verdict was legally insufficient. The defendant argued that the jury failed to find that the statutory aggravating factor was proven given that the eligibility verdict form omitted the culpable mental state required to establish murder in the course of a felony. The trial court found appellate counsel ineffective and vacated the defendant's death sentence.

A majority of this court affirmed and held that appellate counsel was ineffective for failure to seek reversal of the defendant's death sentence on the basis of the defective eligibility verdict. *Mack*, 167 Ill. 2d at 533-38. In so holding, we found appellate counsel's performance to be

deficient for failing to recognize the fundamental importance of a legally sufficient eligibility verdict, which must include a finding on all essential elements of the statutory aggravating factor at issue. *Mack*, 167 Ill. 2d at 533. In support, we pointed out that a culpable mental state of intent to kill or knowledge of a strong probability of death or great bodily harm is an essential element of the particular statutory aggravating factor upon which the defendant's eligibility for the death penalty was based, namely, murder in the course of a felony. *Mack*, 167 Ill. 2d at 533. Next, we found that, had appellate counsel raised the issue of the defective eligibility verdict, there is a reasonable probability that the defendant's death sentence would have been reversed. *Mack*, 167 Ill. 2d at 533-38. We based this finding on a determination that the meaning of the jury's eligibility verdict could not be determined clearly and without speculation from the record, which included a discrepancy between the jury instructions and the verdict form at the eligibility phase. *Mack*, 167 Ill. 2d at 535-37. This court therefore concluded that appellate counsel was ineffective for failing to raise on direct appeal the issue that the death-eligibility verdict was legally insufficient because the jury had not found the mental state necessary for finding the defendant eligible for the death penalty. *Mack*, 167 Ill. 2d at 538.

Here, as in *Mack*, the State relied on the section 9—1(b)(6) statutory aggravating factor of murder in the course of a felony to establish defendant's eligibility for the death penalty. To be eligible for the death penalty under section 9—1(b)(6), a defendant must have "acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(6) (West 1996). In addition, the State here relied on the section 9—1(b)(3) statu-

tory aggravating factor of murder of two or more individuals to establish defendant's eligibility for the death penalty. To be death eligible under section 9—1(b)(3), the deaths must have been the result of "either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(3) (West 1996). Also, as in *Mack*, the jury in this case was properly instructed at the eligibility phase as to the grounds for finding defendant eligible for the death penalty under sections 9—1(b)(6) and 9—1(b)(3), including the aforementioned mental states. The verdict returned by the jury as to defendant's eligibility for the death penalty under section 9—1(b)(6) stated:

"We, the jury, unanimously find beyond a reasonable doubt that the defendant, Maynard McCallister, Jr., is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

(1) the defendant was 18 years old or older at the time of the murders for which he was convicted in this case; and

(2) the following statutory aggravating factor exists: the murdered person(s) was killed in the course of another felony, armed robbery."

The section 9—1(b)(3) eligibility verdict is identical, but with the last line stating: "The defendant has been convicted of killing two or more persons."

Although these death-eligibility verdict forms are similar to the death-eligibility verdict form found deficient in *Mack*, there are significant differences in the circumstances surrounding the respective jury verdict forms. As noted, in *Mack*, the defendant was found guilty at a bench trial but was found eligible for the death penalty by a jury. Consequently, the sentencing jury in *Mack* had not made a determination at the guilt phase of the trial regarding the defendant's mental state while committing the murder. Thus, the jury's decision as to whether the State proved the defendant's mental state

for purposes of finding the defendant eligible for the death penalty under the murder in the course of a felony aggravating factor could not be ascertained from the record. See *Mack*, 167 Ill. 2d at 537 (explaining that all parts of the record will be searched and interpreted together in determining the meaning of a verdict).

In the case at bar, however, the same jury that found defendant eligible for the death penalty had previously found defendant guilty at trial of the intentional or knowing murders of Stanley Williams, Ernestine McCoy and Orlando McCoy. See 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996). Given that the jury returned these guilty verdicts indicating defendant's mental state at the time of the murders, there can be no doubt that the jury found that defendant acted with the mental state required under sections 9—1(b)(6) and 9—1(b)(3). I note too that, at the eligibility phase, the jury in this case was properly instructed as to the mental states required for finding defendant eligible for the death penalty under sections 9—1(b)(6) and 9—1(b)(3). Therefore, under these circumstances, I would hold that the jury's eligibility verdicts were sufficient to affirm defendant's eligibility for the death penalty under sections 9—1(b)(6) and 9—1(b)(3).

Parenthetically, I would also affirm a jury's eligibility verdict where the jury had been properly instructed during the guilt phase of trial on intentional, knowing and felony murder; the jury returned a *general* verdict finding defendant guilty of the offense of first degree murder; and the jury was properly instructed at the eligibility phase as to the culpable mental state required under section 9—1(b)(6), as was the case in *People v. Williams*, 193 Ill. 2d 1 (2000) (Bilandic, J., specially concurring). As noted in my special concurrence in *Williams*, a general verdict raises the presumption that the jury found that defendant committed the most serious crime alleged,

there, that being intentional murder. See *Williams*, 193 Ill. 2d at 53 (Bilandic, J., specially concurring); *People v. Armstrong*, 183 Ill. 2d 130, 151-52 (1998); see also *People v. Cardona*, 158 Ill. 2d 403, 411 (1994); *People v. Johnson*, 149 Ill. 2d 118, 157 (1992). Consequently, when that presumption is considered along with the fact that the jury received the proper instructions as to the requisite mental state at both the guilt phase and the eligibility phase, there is no speculation that the jury found that the defendant possessed the requisite mental state.

As to the case at bar, the meaning of the eligibility verdicts and the intention of the jury is clear, and also requires no speculation on the part of this court. Therefore, the death-eligibility findings by the sentencing jury are valid. This case should not turn on the mere fact that the jury here returned specific verdicts, rather than general verdicts, at the guilt phase of the trial.

I join the majority opinion in all other respects.

JUSTICE MILLER joins in this special concurrence.

CHIEF JUSTICE HARRISON, dissenting:

Under *People v. Mack*, 167 Ill. 2d 525 (1995), the death penalty eligibility verdict form used in this case is legally insufficient. Contrary to the majority's present view, the holding in *Mack* is not limited to situations where the jury which found the defendant death eligible was not the trier of fact at the guilt-innocence phase of the trial. *Mack* announced a bright-line rule which our court has followed even where the same jury heard both the guilt-innocence and death-eligibility phases of the trial. See *People v. Buss*, 187 Ill. 2d 144 (1999). McCallister should therefore be granted a new sentencing hearing.

McCallister's death sentence should be set aside for a second and more fundamental reason as well. As set forth in my partial concurrence and partial dissent in *People v.*

*Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). It is therefore void and unenforceable. Accordingly, McCallister's sentence of death should be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994).